**Bobby H. KIRK, James C. Stallings, James Leonard, Herman Melvin, Plaintiffs-Appellants,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.**

Nos. 80–1535, 80–5295, 80–5312 and 80–5340.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1981.

Decided Dec. 22, 1981.

Rehearing and Rehearing En Banc Denied Feb. 19, 1982.

Scott Daniel and D. C. Daniel, Jr., Murfreesboro, Tenn., Michael T. Tabor and Jane Jarvis, West Tenn. Legal Services, Jackson, Tenn., Karen P. Dennis and Donald A. Donati, Memphis Area Legal Services, Inc., Memphis, Tenn., for plaintiffs-appellants.

Hal D. Hardin, U. S. Atty., Margaret M. Huff, Asst. U. S. Atty., Nashville, Tenn., W. J. Michael Cody, U. S. Atty., Arthur S. Kahn, Asst. U. S. Atty., Memphis, Tenn., Anne Buxton Sobol, Paul Blankenstein, Robert S. Greenspan, Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., for defendant-appellee.

Before KENNEDY and MARTIN, Circuit Judges, and COWEN,* Senior Judge, United States Court of Claims.

CORNELIA G. KENNEDY, Circuit Judge.

This consolidated appeal requires that we decide the constitutionality of the medical-vocational guidelines recently authorized by the Secretary of Health and Human Services for use in disability determinations. For the reasons stated herein, we find the guidelines constitutional and within the Secretary's statutory authority to promulgate regulations.

The medical-vocational guidelines at issue here, also known as the "grid," 20 C.F.R. § 1501 *et seq.* (1981)[1] provide for an orderly sequence of adjudication for social security disability claims. They were issued in response to Congressional criticism surrounding disparate treatment of apparently similar disability claimants. In 1967, Congress had amended the definition of disability to require, for the first time, explicit consideration of vocational factors in the disability determination. Following these amendments the Secretary developed administrative materials for use by state agencies, but these guidelines were not always available and were irregularly applied. *See Vega v. Harris,* 636 F.2d 900, 903 (2d Cir. 1981). Congress then requested that the Secretary spell out disability standards better. In response, the guidelines at issue here were drafted. In March, 1978, the medical-vocational guidelines were published as a notice of proposed rule-making. Shortly thereafter, the House Subcommittee in charge of

---

* The Honorable Wilson Cowen, Senior Judge, United States Court of Claims, sitting by designation.

1. In August, 1980, the Secretary promulgated revised regulations to make them easier to read and understand by removing legalistic language and bureaucratic jargon. 45 Fed.Reg. 55,566 (1980); *Zimiga v. Schweiker,* 651 F.2d 611, 612 n.1 (8th Cir. 1981). Because these revisions affect no issue before us, we will cite the presently codified regulations.

Social Security decided to forego legislative action redefining "disability" until the effect of the new guidelines could be determined. The final regulations became effective on February 26, 1979. 43 Fed.Reg. 55,349 (1978).

The regulations require that an initial determination be made as to whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is found "not disabled." Second, it is determined if the claimant has a severe impairment—one that significantly limits the ability to perform work-related functions; if not, then on the medical evidence alone the claimant is determined to be not disabled. Third, if a severe impairment is found, the impairment is compared against those listed in Appendix 1, 20 C.F.R. Subpart P, Appendix I (1981), to see if, on the medical evidence alone, the claimant can be found to be disabled. Assuming the claimant is not found to be disabled, the fourth step requires inquiry into whether the claimant can perform relevant past work; if so, then the claimant is not disabled. The last step in the sequence is the medical-vocational table challenged here. The ALJ is directed to consider the claimant's residual functional capacity, that is, the level of work the claimant is able to perform (sedentary, light or medium) and the claimant's vocational factors—age, education and prior work experience. *See* 20 C.F.R. § 404.1520 (1981). By this process it is determined whether the claimant is able to perform substantial gainful activity in the national economy. These are precisely the items which the Social Security Act mandates be taken into consideration. 42 U.S.C.A. § 423(d)(2)(A) (1970).

It is important to note that once these components which make up the guidelines are determined, the guidelines themselves direct a conclusion of disabled or not disabled; however, the claimant has the opportunity to present evidence and to rebut and challenge each and every component that makes up the grid before disability is decided.

Of equal significance are the built-in limitations of the grid. The regulations, 20 C.F.R. Subpart P, Appendix II, § 200.00(a) (1981), specifically provide that only when the findings of fact as to each of the relevant components of the grid "coincide" with the grid's definitions, do the guidelines direct a conclusion as to disability.

> Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled. In any instance where a rule does not apply, full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations.

Thus, if the characteristics of the claimant do not identically match the description in the grid, the grid is only used as a guide to the disability determination. *See, e.g., Moguez v. Harris*, 512 F.Supp. 11, 14–15 (D.Colo.1980).

Moreover, the grid also specifically disclaims an ability to predict disability when nonexertional limitations are the focus of a claimant's impairment. 20 C.F.R. Subpart P, Appendix II, § 200.00(e) (1981) provides in pertinent part:

> [W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, [e.g., mental, sensory or skin impairments] the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that could be contraindicated by the nonexertional limitations.

Thus, if the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate residual

functional capacity level, nonexertional limitations must be taken into account and a non-guideline determination made.

It must also be noted, in accord with the above, that the grid only applies if the individual is capable of performing a wide range of jobs at the designated level—*i.e.*, sedentary, light or medium.

Finally, the Secretary, in finding that jobs are available in the national economy, has taken administrative notice of the same sources a vocational expert would utilize. *See* 20 C.F.R. Subpart P, Appendix II, § 200.00(b) (1981). Thus, in most cases, resort to a vocational expert would both be time-consuming and cost inefficient since the effort would only yield information already before the ALJ.

The appellants, Kirk, Stallings, Melvin and Leonard were all denied social security disability benefits by the Secretary after application of the guidelines. Upon their separate appeals to the District Courts (United States District Court for the Western District of Tennessee, Eastern Division; United States District Court for the Middle District of Tennessee, Nashville Division; United States District Court for the Western District of Tennessee, Western Division), the administrative decisions were affirmed. On appeal to this Court appellants raise two distinct questions. First, each alleges that the Secretary's original determination was unsupported by substantial evidence, and thus cannot stand. Secondly, they challenge the medical-vocational guidelines as a whole on a variety of constitutional and statutory grounds.[2] We first examine the challenges to the guidelines as a whole, for a decision nullifying the regulations would require reversal and obviate the need to consider the evidentiary challenges.

A. Exceeding Statutory Authority

■ Appellants argue that the guidelines impermissibly amend the Social Security Act by both altering the judicially created

burden of proof and limiting individualized adjudication.

Appellants first challenge is that in contravention of established precedent interpreting the Social Security Act the guidelines attempt to shift the burden of proof on disability. Once a claimant proved he could no longer perform past work, the burden of proof would shift to the Secretary to demonstrate that the claimant could perform other work in the national economy; failing proof of a particular suitable job, the claimant recovered. As noted in *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980):

> The burden of proof in a claim for Social Security benefits is upon the claimant to show disability which prevents her from performing any substantial gainful employment for the statutory period. Once, however, a prima facie case that claimant cannot perform her usual work is made, the burden shifts to the Secretary to show that there is work in the national economy which she can perform.

*See also Hephner v. Mathews*, 574 F.2d 359, 361–62 (6th Cir. 1978). Appellants argue that the medical-vocational guidelines, by permitting the Secretary to meet his burden of proof without resort to testimony from a vocational expert as has been required, in effect shift the burden of proof.

> To establish the availability of suitable alternative jobs, courts have traditionally preferred the procedure of calling a vocational expert to testify at the administrative hearing [citations omitted]. However, judicial decisions have stopped short of establishing a per se rule requiring such testimony [citations omitted].

*Decker v. Harris*, 647 F.2d 291, 298 (2d Cir. 1981). *See also O'Banner v. Secretary of Health, Ed. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978). Since under the guidelines expert testimony is not required, it is argued that the Secretary is allowed to meet his burden without particularly identifying the specific jobs in the national economy

---

**2.** For the sake of simplicity appellants' challenges to the guidelines are dealt with as a whole without designating which appellant raised which argument. If the guidelines are invalidated, remand of all of the cases would be required.

which the applicant can perform and which therefore prevent recovery. This, appellants claim, is an impermissible alteration and exceeds the Secretary's power to issue regulations.

Appellants' second challenge is that the regulations conflict with the Social Security Act's requirement of individualized treatment of claimants and thus exceed the Secretary's authority. "[T]here are limits, grounded in the language, purpose, and history of the particular statute, on how far an agency properly may go in its interpretative role." *Teamsters v. Daniel*, 439 U.S. 551, 566, 99 S.Ct. 790, 799–800, 58 L.Ed.2d 808 (1979).

We find *Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981) to be dispositive. In that case the Court was confronted with the Secretary's interpretation of the Social Security Act's Medicaid program. The Secretary had promulgated regulations governing when the income of one spouse may be "deemed" available to the other. In upholding the regulations, the Court placed special emphasis on Congress having "explicitly delegated to the Secretary broad authority to promulgate regulations defining eligibility requirements for Medicaid." *Id.* at 2640. Since the regulations were consistent with the statutory scheme and were reasonable exercises of the delegated power, the regulations were upheld.

Similarly, in the instant case, Congress delegated broad authority to the Secretary to draft regulations implementing the Social Security Act's disability provisions. 42 U.S.C.A. § 405(a) (1970). In fact, Congress had urged the Secretary to promulgate regulations a number of times before the present regulations were issued. Congress is undoubtedly aware of the regulations so issued, and has taken no action to modify either the definition of disability or the regulations themselves. We are of the opinion that the regulations fully comport with Congressional intent.

In arguing that individualized treatment of a claimant is required by the Social Security Act, appellant's rely on *Hephner v.* *Mathews*, 574 F.2d 359, 362–63 (6th Cir. 1978). There the Court stated:

A finding of a capacity to do light work does not constitute evidence that a person can engage in substantial gainful activity, nor is such a finding sufficient to rebut a prima facie case of disability. A claimant's capacity to perform work must be evaluated in light of *his* age, *his* education, *his* work experience, and *his* impairments, including *his* pain. This requires a finding of capacity to work which is expressed, not in terms of a vague catch-all phrase such as 'light work', but in terms of specific types of jobs. (emphasis in original).

*Hephner*, decided before the grid at issue here became the applicable law, does not require rejection of the grid. *Hephner's* interpretation and rationale is still applicable and its demands are satisfied by use of the grid. The grid too requires that a claimant's particular characteristics be evaluated before a disability determination is reached; the grid merely identifies the weight to be given each characteristic found. The grid *has* displaced the Secretary's burden of demonstrating which particular jobs the claimant can perform. But, that does not render the regulations invalid. The grid itself takes into account the same sources which a vocational expert would consult in determining whether a particular claimant's abilities matches a job's requirements, yet provides greater uniformity with fewer administrative costs. We find that, even though expert vocational testimony is no longer necessary, use of the grid substantially comports with prior case law interpreting the Social Security Act.

The courts that have confronted this issue have split widely over the Secretary's ability to carry the burden of demonstrating the availability of jobs, without use of a vocational expert, by relying on the guidelines. In *Boyce v. Harris*, 492 F.Supp. 751 (D.S.C. 1980), the court noted that one of the purposes of the guidelines was to dispense with the necessity of hearing from a vocational expert for often their testimony conflicted and was always time consuming. "The un-

derlying rationale of [pre-grid cases requiring expert testimony] seems to have been made obsolete by the new Vocational Factors Regulations . . . . " *Id.* at 751. Expert testimony would be duplicative of the information contained in the grid. It should be emphasized that the grid is only used when the components of the grid precisely match the characteristics of the claimant. Thus, the only role the guidelines play is to take administrative notice of the availability of jobs, or lack thereof, for claimants whose abilities are accurately described by the grid. Of course, if the claimant's characteristics do not fit the grid pattern, then, just as before, expert testimony would be required to satisfy the Secretary's burden of proof regarding the availability of jobs which this particular claimant can exertionally handle. *See also Walker v. Harris,* 504 F.Supp. 806, 811 (D.Kan.1980) ("We are in agreement with the Secretary that a vocational expert is not necessary when the factors of a claimant's residual functional capacity, age, education and work experience coincide with the criteria of a rule under the new regulations and the rule directs a conclusion as to whether the individual is or is not disabled."); *Frady v. Harris,* 646 F.2d 143 (4th Cir. 1981); *New v. Harris,* 505 F.Supp. 721, 726 (S.D.Ohio 1980).

It is true, as the appellants assert, that some cases have found the grid invalid.[3] But, we find those cases' reasoning less persuasive. *See, e.g., Powell v. Schweiker,* 516 F.Supp. 1001, 1003 (W.D.Ark.1981) ("This Court is persuaded that in order to provide the particularized proof sufficient to resolve this issue, the need for the testimony of a vocational expert remains.");

*Phillips v. Harris,* 488 F.Supp. 1161 (W.D. Va.1980). In view of the fact that Congress authorized the Secretary to promulgate regulations and is undoubtedly familiar with the regulations so promulgated, we find that the Secretary's guidelines do not impermissibly amend the Social Security Act but instead are a valid exercise of the Secretary's power to issue regulations pursuant to 42 U.S.C.A. § 405(a).

**B. Constitutional Challenges**

Appellants raise a number of constitutional challenges to the new regulations. They allege that the guidelines' distinctions are arbitrary and capricious, that the government's policy and laws regarding age discrimination have been violated, that the guidelines create irrebuttable presumptions in violation of recent Supreme Court precedent, and that the guidelines robotize the adjudicative process, in violation of due process guarantees, by failing to give claimants a meaningful opportunity for individualized determinations. For the reasons set forth below, we find each of these arguments to be unpersuasive and uphold the constitutionality of the medical-vocational guidelines.

■ The guidelines are arbitrary and capricious, appellants argue, because the distinctions drawn are without reasonable justification. They point to the differing treatment potentially afforded workers separated by one or two months in age as an example of arbitrariness. We find this argument to be without merit.

All parties agree that Congress may delegate its authority to prescribe regulations.

---

**3.** A recent case from this Circuit, *Gaines v. Secretary of Health and Human Services,* 657 F.2d 99 (6th Cir. 1981), is not dispositive of this issue. The *Gaines* Court decided that the Secretary had the burden of proving that the claimant had the physical capacity to perform light work, a burden which the Secretary failed to meet. *Gaines* did not address the issue presented here, that is, whether the Secretary can meet his burden of proof on the availability of work by relying on the guidelines. We agree with the conclusion of *Gaines* that the Secretary must demonstrate the applicability of the

grid before the grid is in fact applied. *See also Smith v. Schweiker,* 520 F.Supp. 27, 34–5 (D.N.H., 1981) ("The Medical-Vocational Guidelines . . . have been held to satisfy the Secretary's burden of demonstrating the existence of alternative work for a plaintiff who is unable to return to his past relevant jobs because of his exertional impairments [citations omitted]. The Secretary carries his burden of proof by supporting with substantial evidence findings that claimant meets each criterion in a particular rule in Appendix 2").

*United States v. Rock Royal Cooperative,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). It is equally clear that the Secretary's response to this delegation of authority is entitled to great deference by the courts. *See Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 251, 99 S.Ct. 505, 514–515, 58 L.Ed.2d 484 (1978); *Schweiker v. Gray Panthers,* 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981):

> Rather, the Secretary's definition is entitled to 'legislative effect' because, '[i]n a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term.' [citations omitted]. Although we do not abdicate review in these circumstances, our task is the limited one of ensuring that the Secretary did not 'excee[d] his statutory authority' and that the regulation is not arbitrary or capricious.

To challenge successfully the medical-vocational guidelines, appellants must demonstrate that no reasonable basis exists for the distinctions drawn for "[u]nless the limitation imposed by Congress is wholly irrational, it is constitutional. . . ." *Califano v. Aznavorian,* 439 U.S. 170, 177, 99 S.Ct. 471, 475, 58 L.Ed.2d 435 (1978).

It is beyond peradventure that the medical-vocational guidelines are rational legislative and administrative distinctions drawn on the basis of the years of experience the Secretary has had in disability determinations. It is impossible, therefore, to say that the "limitation[s]" imposed are "wholly irrational." Thus, they must be deemed to withstand attack on general equal protection grounds.

■ Appellants make the more specific attack that the national policy against age discrimination is violated by the guidelines.[4] They assert that the line-drawing between differing ages noted above is in violation of this national policy. They seize upon the Secretary's alleged "admission" that no data or sources were available which "relate

varing [sic] specific chronological ages to specific vocational limitations for performing jobs." 43 Fed.Reg. 55,349, 55,353 (1978). Hence, the argument runs, the lines drawn on the basis of age were not based on sufficient information to make them rational and are, therefore, unconstitutional.

We find this argument unconvincing. While the Secretary did acknowledge that specific data sources were unavailable to draw precise age classifications, nonetheless, the prior experience of the Social Security Administration in judging the effect of age in job acquisition was utilized in "determining when age makes a difference in disability determinations. . . ." *Id.* In line with the Secretary's acknowledgement, the regulations specifically provide that age cut-off lines are not to be applied mechanistically. 20 C.F.R. § 404.1563(a) (1981) states: "We explain in detail how we consider your age as a vocational factor in Appendix 2. However, we will not apply these age categories mechanically in a borderline situation." Thus, the regulations themselves take into account the lack of precision which arbitrary line-drawing always involves. Finally, it is clear that administrative distinctions need not be drawn with mathematical precision, especially when government *benefits* are being distributed. As the Court recently stated in *Aznavorian, supra,* at 174–5, 99 S.Ct. at 473–474 in upholding travel restrictions on the right to receive social security benefits:

> Social welfare legislation, by its very nature, involves drawing lines among categories of people, lines that necessarily are sometimes arbitrary. This Court has consistently upheld the constitutionality of such classifications in federal welfare legislation where a rational basis existed for Congress' choice.
>
> . . . In enacting legislation of this kind a government does not deny equal protection 'merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Con-

---

4. While this attack is on a statutory as well as a constitutional basis, it is dealt with here be-

cause of its relationship to the due process claim.

stitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." ' *Dandridge v. Williams* . . .

Given the flexibility mandated in the application of the age rules, and the lenient constitutional test that social welfare legislation undergoes the medical-vocational guidelines neither violate the equal protection clause nor impermissibly discriminate against the elderly.[5]

■ Appellants' next constitutional challenge is that the grid creates an irrebuttable presumption by requiring the ALJ to direct a conclusion with regard to disability once the components of the grid have been established. Thus, they argue, they are precluded from rebutting the ultimate finding once all factual controversies have been resolved in the Secretary's favor. However, appellants *do* have the opportunity to rebut all factual findings that make up the components of the grid and hence have the same opportunity to present evidence that they did under old case law.

Appellants rely on *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), (holding a statute unconstitutional for lack of due process which presumed unmarried fathers to be unfit parents), *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (holding an irrebuttable presumption that a student with an out-of-state address at the time of his application to college remains a non-resident for tuition purposes violative of due process), *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (holding a conclusive presumption that pregnant teachers were unfit to continue working after reaching the fifth month of pregnancy invalid) and *Turner v. Dept. of Employment Security*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975) (holding a conclusive presumption that women were incapable of working for a period preceding and following pregnancy infirm). These

cases are inapposite. No irrebuttable presumptions are involved here. Rather, what we have is a statutory classification. As noted by one commentator:

> Perhaps the most serious defect in the conclusive presumption doctrine is that it rests upon a disingenuous, misleading analysis. It has long been recognized that there cannot be a conclusive 'presumption,' at least if the term is used to refer to an evidentiary burden-shifting device. When a statute provides that certain consequences shall flow from fact A and then provides that from proof of fact B the existence of fact A shall be conclusively presumed, the practical effect is to make fact A irrelevant. The same result would be achieved by making the statutory consequences turn directly on fact B. The only genuine constitutional question in this situation is whether it is permissible to derive the given consequences from fact B. A procedural due process claim based upon a supposed right to present evidence of fact A is no more warranted than a claim concerning any other irrelevant issue. While it might be esthetically more pleasing for the legislature to say what it means—formulating the provision directly in terms of fact B, instead of resorting to the fiction of a conclusive presumption—this stylistic flaw violates no one's procedural rights. (footnote omitted).

Note, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?*, 72 Mich.L.Rev. 800, 827–28 (1974); *See also* Note, *Irrebuttable Presumptions: An Illusory Analysis*, 27 Stan.L.Rev. 449, 463 (1975) ("[E]very rule of substantive law effecting a summary classification can be recast in terms of an irrebuttable presumption."); Note, *The Irrebuttable Presumption Doctrine in the Supreme Court*, 87 Harv.L.Rev. 1534, 1544 (1974). The regulations merely presume that light work exists for claimants found capable of performing a wide range of light work; once this is demon-

---

**5.** Although appellants cite the Age Discrimination in Employment Act, 29 U.S.C.A. § 621

(1970), they point to no violation of the Act.

strated, the disability determination follows as a matter of statutory classification as to what constitutes "disability."

Each appellant was given the opportunity to challenge the four factual findings that make up the grid—age, work experience, physical ability and education. Only the conclusion of the existence of sedentary, light or moderate work is mandated. Since the guidelines specifically require every characteristic to be fully satisfied before the grid is applied, the effect of the grid is only to ensure uniformity and ease of application. Appellants here cannot be said to complain of the opportunity to present evidence, as did the plaintiffs in the cases appellants cite; rather, appellants complain of the ultimate disability decision made on the basis of the evidence presented.

> [B]enefits here are available upon compliance with an objective criterion, one which the Legislature considered to bear a sufficiently close nexus with underlying policy objectives to be used as the test for eligibility . . . . [A]ppellees are completely free to present evidence that they meet the specified requirements; failing in this effort, their only constitutional claim is that the test they cannot meet is not so rationally related to a legitimate legislative objective that it can be used to deprive them of benefits available to those who do satisfy that test.

*Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975). As noted already, appellants are unable to argue successfully that the guidelines are so unrelated to a legitimate legislative goal as to violate this 'rational relationship' test. *See also Jackson v. O'Bannon*, 633 F.2d 329, 339 (3rd Cir. 1980) ("[T]he irrebuttable presumption analysis is inapplicable to challenges to aspects of social welfare programs."); *Sakol v. C.I.R.*, 574 F.2d 694, 698 (2d Cir.) *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978) ("[C]ongressional judgments in the form of irrebuttable presumptions in the economic area will be upheld where there is a rational relationship between the criteria set forth in the statutory mandate and a legitimate Congressional purpose").

We are of the opinion that the recent cases of *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) and *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) answer the instant argument. In *Salfi* the Supreme Court held that a nine month duration-of-relationship requirement to qualify for social security insurance benefits comported with the due process clause. The Court distinguished the holdings in *Stanley, Vlandis*, and *LaFleur*. The Court distinguished *Vlandis* by noting that if the state conditions eligibility for benefits on residency, it must permit claimants to present evidence clearly bearing on the residency issue. Here, the grid utilizes four components and the claimant is encouraged to produce all relevant evidence bearing on these issues. In *Stanley* and *LaFleur* the Court did not deal with a "noncontractual claim to receive funds from the public treasury [which] enjoys no constitutionally protected status." *Salfi, supra*, 422 U.S. at 772, 95 S.Ct. at 2470. Since we deal here with less constitutionally protected activity than the family (*Stanley*) and the work place and sex discrimination (*LaFleur*), fundamental constitutional interests, the irrebuttable presumption challenge fails. Likewise, in *Turner*, the Court upheld a conclusive statutory presumption that entitled coal miners to total disability once clinically diagnosed as suffering from complicated pneumoconiosis notwithstanding a challenge based upon irrebuttable presumption grounds. The Court noted:

> Were the Act phrased simply and directly to provide that operators were bound to provide benefits for all miners clinically demonstrating their affliction with complicated pneumoconiosis arising out of employment in the mines, we think it clear that there could be no due process objection to it. . . . Since Congress can clearly draft a statute to accomplish precisely what it has accomplished through [the statute's] presumption of disability, the argument is essentially that Congress has accomplished its result in an impermissible manner—by defining eligibility

in terms of 'total disability' and erecting an 'irrebuttable presumption' of total disability upon a factual showing that does not necessarily satisfy the statutory definition of total disability. But in a statute such as this, regulating purely economic matters, we do not think that Congress' choice of statutory language can invalidate the enactment when its operation and effect are clearly permissible.

*Turner, supra,* 428 U.S. at 23–24, 96 S.Ct. at 2896–2897. Since we find the guidelines to be merely a substitute for legislative line-drawing, we reject appellants' challenge on irrebuttable presumption grounds. The Secretary is permitted to determine what constitutes disability and although the medical-vocational guidelines arguably speak in irrebuttable presumption language, we will not "invalidate the enactment when its operation and effect are clearly permissible."

■ Finally, appellants rely on *Santise v. Harris,* 501 F.Supp. 274 (D.N.J.1980), where the court on its own initiative found the regulations invalid.

This section [the one that defines disability] clearly places the job of determining whether a claimant is capable of retaining 'substantial gainful work' on the A.L. J.'s shoulders. H.E.W.'s grid, in contrast, requires the A.L.J. not to make that key statutory fact finding, rather the grid requires the A.L.J. to determine the claimant's 'residual function capacity,' age, education, and previous work experience. The A.L.J.'s job is then finished as the grid decides the 'fact' of whether the claimant is capable of retaining 'substantial gainful work.' Simply put, the human function of judging cannot be replaced by robotized resort to a grid.

*Santise, supra,* at 277. *See also Stewart v. Harris,* 508 F.Supp. 345 (D.N.J.1981).

We are of the opinion that the *Santise* court misconstrued the practical effect of the grid. The grid comes into play only when the claimant's characteristics precisely coincide with the grid. In any other situation the grid is used at most for guidance in the disability determination. When the claimant does indeed match one of the grid's patterns, then all the grid does is announce that substantial gainful work in the national economy is available for that particular individual; in other words, once a finding is made that the individual can do light work, for example, the grid operates to declare that light work is available. To us, that is neither robotization of the adjudicative process, nor an impermissible method to simplify, symmetrize and expedite disability determinations. *See Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981) (No robotization given regulations' own limitations on their applicability).

C. The Individual Cases

■ Finding that the regulations are facially valid, we now proceed to evaluate the evidence presented in each of the four cases before us for review. The duty of the reviewing courts is to ensure that the regulations are applied in accordance with their spirit, their purpose and the bounds of the due process clause. Crucial to such an evaluation is the guarantee that each of the four component factors of the grid coincide with the characteristics of the claimant before the grid is applied. It must be stressed that each of the four findings of fact necessary to application of the grid must be supported by substantial evidence before the disability determination based on the grid should be upheld by the appellate courts. Rote application of the grid cannot be countenanced. The incorrect application of the guidelines will invalidate the disability determination. *See Phillips v. Harris,* 488 F.Supp. 1161 (W.D.Va.1980).

■ At the outset it should be noted that the ALJ's findings are not to be overturned unless there is no substantial evidence supporting such conclusions. "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *citing Consolidated Edison v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

In determining the question of substantiality of the evidence, reports of physicians who have treated the claimant/patient over a number of years are to be given greater weight than are reports of physicians employed and paid for by the government for the purpose of defending against a disability claim. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). Finally, a reviewing court is to look at the evidence "taken as a whole." *Allen, supra.*

██ Appellant Kirk challenges the finding of the ALJ that he is not disabled on a number of grounds. The appellant alleged that he was disabled due to emphysema and "nerves." He testified he suffers from smothering spells, depression, bad feet and arthritis. Record[6] at 56. He takes 25 milligrams of Elavil and Thorazine daily. Record at 60. The appellant and his wife testified that appellant's "nerves" were his worst complaint. Record at 70, 72, 190. In 1972, the appellant was treated for a nervous breakdown following the death of his son who had been killed by a car. At the time of his application for benefits, appellant was 41 years old and had an eighth grade education.

The medical reports are contradictory. The record reveals a number of treating physicians. Yet, the majority of those who diagnosed appellant concluded that his psychological and physical problems permitted light work at the very least. Record at 105–7, 119–20. One doctor stated that the alleged psychological impairments were self-imposed and exaggerated in order to qualify for social security benefits to which the appellant felt himself entitled. Record at 117. Only one physician indicated that his mental condition was disabling and his outlook for recovery not particularly good.

Record at 127. While appellant argues that this doctor was his treating physician, and thus his diagnosis entitled to greater weight than the reports of other physicians, the ALJ was entitled to consider the other reports including a later psychiatric report submitted by claimant.

The record reflects that a second administrative hearing was held after the appellant had moved to the State of Utah. To attend his hearing, at Nashville, Tennessee, the appellant drove for 72 straight hours, sleeping only in the car for short periods of time. At this second hearing, additional medical evidence was admitted from appellant's treating physicians in Utah. The most informative assessment came from his new psychiatrist who testified that appellant's impairments were significant only when he had to deal with co-workers. Record at 200–04.

The ALJ concluded that appellant suffered from no impairments which precluded gainful employment. Kirk was found to be a "younger individual," to have had a "limited" education, and to have had only "unskilled" work experience. The ALJ did, however, specifically find that appellant could no longer work as a carpenter, his relevant past work. Contrary to appellant's assertion, his nonexertional maladies were specifically considered, but the ALJ found that his mental impairments did not limit his ability to perform a wide range of light work. Record at 144. Plugging appellant's characteristics into the grid, the ALJ utilized Rule 202.17 in determining that appellant was not disabled.

The District Court affirmed the decision of the ALJ after fully reviewing the testimony elicited at both hearings.[7]

---

6. Each appellant has his own record on appeal. Thus, all references to the "Record" will be the record for the individual appellant being discussed.

7. The District Court affirmed the ALJ for two reasons. First, he found substantial evidence to uphold the factual findings. Second, the District Court felt that the grid need not be applied at all since Kirk could allegedly perform past work. The court relied on appellant's obvious ability to drive long distances in ruling that appellant's prior work experience as a truck driver was relevant past work notwithstanding its remoteness in time. However, the regulations provide:

We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled ... applies. A gradual change occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in

We too are persuaded that the decision of the ALJ was supported by substantial evidence taking the record as a whole and affirm the decision denying social security benefits. Resolution of conflicting factual assertions is peculiarly suited to the adjudicator able to gauge the demeanor of the witnesses. Central to resolution of the case is the sincerity of claimant. The medical evidence was at best contradictory. The ALJ's determination that appellant suffers from no disabling mental or physical illness is substantiated by the record.

While appellant argues that the Secretary violated his own regulations by applying the grid to him, we find this claim meritless. Appellant relies on 20 C.F.R. Subpart P, Appendix II, § 200.00(e) (1981) which provides:

> [T]he rules . . . may not be fully applicable where the nature of an individual's impairment does not result in [physical] limitations, e.g., certain mental, sensory, or skin impairments.
>
> . . . .
>
> Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor. . . .

Appellant claims that his impairments were mental, and thus not within the focus of the grid. However, before reaching the conclusion that the grid will not be applied because claimant alleges nonexertional limitations, those nonexertional limitations must be severe enough to restrict a full range of gainful employment at the designated level. The ALJ in the instant case found appellant Kirk's nonexertional limitations to be insufficiently severe to alter the conclusion that he could do a full range of light work. If appellant's argument were taken to its logical conclusion, any allegation of nonexertional limitations would preclude resort to the grid and thus frustrate the Congressional intention of simplifying and expediting the adjudicative process. Thus Kirk's real quarrel is with the sufficiency of the evidence to support the ALJ's finding that Kirk had no significant mental impairment.

▮▮▮ Appellant Melvin's arguments are similar to those of Kirk. Melvin was 47 years old at the time of the hearing and had a sixth grade education. He originally filed for benefits at the end of 1975 following surgery on his back. He was denied compensation and before requesting a hearing with an ALJ his appeal time lapsed. The Secretary found him capable of performing a full range of sedentary work and able to adjust to a number of sedentary jobs.

The instant petition was filed pursuant to the new regulations, and yet the conclusion was identical—the petitioner was deemed capable of performing a range of sedentary jobs and was denied social security benefits. The ALJ concluded that no new material evidence had been submitted requiring reversal of the original denial. The ALJ concluded that appellant was a "younger individual." He had a "marginal education." His past relevant work included time spent as a store manager and was therefore deemed "skilled." The ALJ did find, how-

a job done then continue to apply. The 15-year guide is intended to insure that remote work experience is not currently applied. 20 C.F.R. § 404.1565(a) (1981). The District Court was aware of this regulation, but held that the purpose of the regulation would not be served here since job requirements and skills for truck drivers had not changed much during the ensuing years. We indicate no view regarding the propriety of utilizing work experiences greater than the 15-year presumption. We do note, however, that taking *judicial notice* of job availability and job requirements has in the past been disfavored. *See, e.g., Wilson v. Califano,* 617 F.2d 1050 (4th Cir. 1980);

*O'Banner v. Secretary of Health, Education & Welfare,* 587 F.2d 321, 323 (6th Cir. 1978) ("The scope of review requires that there be something more than the mere intuition or conjecture by the administrative law judge" before he concludes that jobs are available.); *Maurer v. Harris,* 502 F.Supp. 320, 323 (D.Or.1980). In the present case, that is all too apparent. There is no evidence as to whether appellant's emphysema affects his performance as a truck driver; at the very least, if it is to be claimed that truck driving is a job that appellant could perform, he ought to be given the opportunity to challenge that determination in the administrative setting.

ever, that the appellant was unable to engage in his immediate past work as a truck driver. Applying Rule 201.20 of the grid, the ALJ found the claimant not disabled.

Appellant's major complaint is that he suffers from intractable pain following surgery in April, 1975. The doctors identified his illness as chronic post-laminectomy syndrome. The pain infiltrates his lower back, hips, and legs. Record at 41.

At the hearing appellant testified that he can drive his car up to three times daily. Record at 37. He takes, per prescription, Darvon and Darvocet. Record at 42. He testified that he is able to walk 100 yards before needing rest. Appellant's three witnesses corroborated his testimony. Record at 49–53. A vocational expert testified in the instant case and indicated a number of jobs which appellant could perform and quickly learn. Record at 129.

Appellant's surgeon, a Dr. Beddow, testified originally that Melvin was capable of performing moderate work. Record at 138. Six months later, that diagnosis was modified to limit appellant's activities to sedentary work. Record at 141. Another treating physician, Dr. Black, in a fairly detailed report, indicated that appellant had a permanent impairment of 15% of his entire body, and that appellant was disabled from all forms of gainful employment. A year and a half later, Black indicated that Melvin would still be disabled "except [for] the most sedentary" employment. Record at 146. This latter diagnosis was confirmed by a Dr. Patikas, but she neither examined nor spoke with the appellant; she had only interpreted his medical records. Record at 148. Six months after his second report noted above, Dr. Black indicated that appellant was "totally and permanently disabled for any type of gainful employment." Record at 150. No data was supplied to substantiate this latest assertion. Finally, a Doctor Meirowsky examined the patient on behalf of the government in July, 1979. He submitted the most detailed report of all the examining physicians. He could find no evidence of disc disease and hence concluded that the patient's symptoms could not be explained "on the basis of any organic pathology." Record at 155. Meirowsky filled out a physical capacities evaluation which rated appellant's physical abilities quite highly.

The District Court found the decision of the ALJ to be supported by substantial evidence. The conflicts in the medical testimony were for the ALJ to resolve, the court said, as was appellant's credibility.

It is true, as appellant alleges, that pain may be a sufficient disability for social security purposes, *Glass v. Secretary of Health, Ed. & Welfare*, 517 F.2d 224 (6th Cir. 1975); and while it is true that a treating physician's diagnosis is to be given greater weight in the scales than the government's physician, that is only appropriate if the treating physician supplies sufficient medical data to substantiate the diagnosis. 20 C.F.R. § 404.1529 (1981). Here, appellant's doctors often concluded, without much medical support, that he was prevented from pursuing all work opportunities. These broad conclusory formulations, regarding the ultimate issue which must be decided by the Secretary, are not determinative of the question of whether or not an individual is under a disability. 20 C.F.R. § 404.1527 (1981). This is particularly true when pain is the disabling illness. *Allen v. Califano, supra*, at 145; 20 C.F.R. § 404.-1529 (1981). The physician who supported appellant's claim, Dr. Black, repeatedly changed his mind about appellant's abilities. The majority of medical testimony indicated that sedentary work was possible. Since credibility, especially with alleged pain, is crucial to resolution of the claim, the ALJ's opportunity to observe the demeanor of the claimant "is invaluable, and should not be discarded lightly." *Beavers v. Secretary of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978). For these reasons we find substantial evidence to support the ALJ's determination that appellant Melvin is not disabled within the meaning of the Social Security Act and affirm the District Court.

■ Appellant Stallings' claim was filed in 1978. He was 41 years of age when his

insured status expired. He has a third grade education, but was found to be functionally illiterate. His relevant past work consisted mainly of operating a punch press, with stints as a furnace operator and innkeeper, but all were considered unskilled for purposes of the grid. His medical ailments include arthritis, post-surgical back problems and "nerves." Appellant also had an alcohol problem, consuming up to 12 beers a day. Record at 59. His medication includes high-blood pressure pills, "relaxing pills" (Valium) and pills for arthritis. Record at 59.

Immediately following back surgery appellant qualified for disability payments. However, these payments were terminated when it was found that appellant's medical condition had improved sufficiently. Record at 96–7. Appellant did not appeal that determination. The present controversy centers on appellant's subsequent re-injury of his back when he attempted to pick up a 400 pound metal basket. Record at 53.

The ALJ specifically found that appellant could no longer perform his past work as a punch press operator. Moreover, he found that Stallings had a history of schizophrenia and breakdowns and presently suffered from chronic anxiety. However, he found that appellant was not disabled even given these findings. Record at 11. Once again the question on this appeal is whether substantial evidence supports the ALJ's determination that Stallings' mental condition does not interfere with gainful employment.

Many psychiatrists examined the appellant and none concluded that he was severely impaired due to his mental problems. Dr. Godsey concluded that appellant suffered from anxiety neurosis, but did not indicate the extent, if any, of an impairment. While Godsey concluded that appellant's prognosis was "guarded", that was due mainly to appellant's somatic complaints, not his mental afflictions. Record at 159. Dr. Harvey felt appellant's schizophrenia was in remission, but he failed to give a detailed report. Record at 230. Dr. Green concluded appellant had mild anxiety

neurosis, but only a mild impairment; he retained the ability to function effectively. Record at 240. Thus, the ALJ was entitled, we feel, to discount the effect of appellant's alleged nonexertional limitations.

The ALJ concluded that, physically, appellant could perform a full range of light work. That finding too is supported by substantial evidence. Appellant's pain was not found to be vocationally restrictive. Most of the physicians who examined Stallings indicated that he was capable of performing light work, notwithstanding his lumbar laminectomy and spinal fusion. Record at 145–6, 234–5, 155–6, 162. The only negative report emanated from a psychiatric evaluation made by an orthopedist, which the ALJ was entitled to discount. Record at 162. Finally, appellant admitted that during the entire course of his proceedings to obtain social security benefits he had actively sought employment. That too could discount his claim of disability. Record at 76–7.

The District Court found substantial evidence to sustain the ALJ's determinations. *Stallings v. Harris*, 493 F.Supp. 956 (W.D. Tenn.1980). Since we also find substantial evidence to uphold the findings made below we affirm the decision of the District Court and the ALJ.

 Appellant Leonard presents us with an unusual case. In 1968, Leonard had a piece of his lung removed and he received disability benefits during this period of hospitalization. He returned to work in 1971 on orders from his doctor and continued working until September, 1978. He filed for benefits in September, 1978, alleging he had become disabled in January, 1978, due to stomach trouble, kidney stones and a recurrence and worsening of his lung problems. He does not complain of nonexertional limitations. Record at 40.

Appellant was 49 years of age at the time of the ALJ's decision and was thus "closely approaching advanced age." He lives in a two-story apartment and sleeps on the second floor, twelve steps up. He does not drive. While appellant has a fifth grade education, he claims that he can only read

**540**

and write "not too good"; he cannot do simple arithmetic. Record at 32. Nonetheless, he was found to have a limited education. His previous work consisted of loading crates for Coca Cola which is unskilled work. He claims that he is a recovered alcoholic, although there is an indication that he still drinks to excess. He smokes about a pack of cigarettes per day. He claims that he can sit for two hours at a time and stand for one hour. Record at 39.

The ALJ found the appellant could no longer perform his immediate past work. However, he did find, pursuant to medical testimony, that Leonard could do light work. The medical evidence consisted of a report from Doctor Haimsohn, made after an October, 1978, examination of appellant. Record at 99–102. He stated that while appellant did indeed have a severe respiratory impairment, namely, chronic obstructive and restrictive pulmonary disease, he could do light work. Thus, applying Rule 202.10 of the grid, Leonard was not deemed disabled and his benefits were denied. Record at 14. The limited medical testimony supports the ALJ's determination that appellant could do light work. However, because we find that the grid was improperly applied in this case, we cannot uphold the ultimate conclusion that appellant's benefits be denied.

The ALJ found that appellant had a "limited" education. 20 C.F.R. § 404.1564(b)(3) (1981) provides:

> Limited education means ability in reasoning, *arithmetic*, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties

needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through 11th grade level of formal education is a limited education. (emphasis supplied).

At the outset, it must be noted that appellant was educated only through grade five. The uncontradicted testimony also indicated that he was incapable of performing even simple arithmetic. Thus, appellant argues that he should have been characterized as illiterate which requires an "inability to read or write . . . a simple message." 20 C.F.R. § 1564(b)(1) (1981). It is apparent, however, that "illiteracy" is not the proper description of appellant's abilities since he could indeed read and write albeit "not too good." While the category of "marginal education" closely approximates appellant's abilities and grade level, 20 C.F.R. § 404.-1564(b)(2) (1981), it still requires an aptitude in arithmetic which appellant just does not possess. Consequently, this is one of those situations where no category perfectly matches appellant's characteristics. Hence, the grid should not have been applied. And since applying the "marginal" or "illiterate" category would have made a difference in the determination of benefits, we remand the case to the District Court with direction to remand to the Secretary to make further findings of fact.[8] Testimony of a vocational expert will likely[9] be required to illuminate which jobs, if any, appellant can handle with his disabilities and educational background. *See, e.g., Moguez v. Harris*, 512 F.Supp. 11, 14–15 (D.Colo.1980):

> [S]ince the plaintiff's functional capacity does not coincide with criteria of Table

---

**8.** The Secretary argues that under the grid appellant Leonard must be illiterate to recover benefits; since he was clearly not illiterate, he cannot recover. However, this argument ignores the clear mandates of the grid which dictate that when a claimant does not precisely fit the grid's mold, the grid is inapplicable and the applicant is entitled to further individualized determination of the availability of work. The fact remains that the Secretary has failed to satisfy his burden of proving that the grid was appropriate given Leonard's particular factual circumstances. It is now incumbent upon

the Secretary, as in pre-grid case law, to demonstrate a job which appellant can exertionally handle and educationally satisfy. We intend to indicate no view regarding appellant's ultimate entitlement to disability benefits.

**9.** As noted previously, expert vocational testimony was not always required prior to a disability determination. Thus, we make no new law today. Expert testimony will still be left to the discretion of the ALJ with the same standards of review as in pre-grid case law. *See Decker v. Harris, supra; O'Banner, supra.*

No. 1, some vocational evidence in some form, including a description of the duties of specifically identifiable jobs, must be presented and matched to the individual claimant's age, education, experience and functional restrictions. It may be proper for the ALJ to take administrative notice of jobs which the plaintiff has the ability to perform by examining a book containing job titles and descriptions and placing on the record the duties of specifically identified jobs. 20 C.F.R. § 404.1509(c) [1980]. In any event, the new regulations do not provide administrative notice that jobs exist in the national economy for a person with this claimant's functional restrictions.

Appellant's other arguments are rendered moot by this decision.

This case is an example of the type of situation about which appellants complain— the robotization of the adjudicative process. Here, the appellant fell into one of the many cracks in the grid, and yet, the grid was hastily applied. While this mechanized application does not indicate that the medical-vocational guidelines themselves are improper, courts must be wary of approving too-quickly the guidelines' wholesale application without ensuring that substantial evidence corroborates each of the components of the grid. As the Court noted in *Phillips v. Harris, supra,* at 1166:

> In cases recently before the court in which the new regulations have been applied, the court has noted a tendency of administrative law judges to disregard specific facts of an individual case while over-emphasizing the mechanical formulations of the Appendix II criteria.... Absent a meaningful statement of the weight attached to the medical evidence ... considered in combination with the physical impairments, and absent a statement of the reasons felt to be in support of the given conclusion, the final decision of the Secretary cannot be deemed to be supported by 'substantial evidence.'

*See also Walker v. Harris,* 504 F.Supp. 806, 811–12 (D.Kan.1980). Here, there was unsubstantial evidence to support the finding of the ALJ that appellant Leonard had at least a limited education. With proper application, the guidelines serve to facilitate the adjudicative process, simplify the law, and symmetrize disability determinations. They are constitutionally permissible manifestations of Congressional intent and we uphold their proper application to appellants Kirk, Melvin and Stallings. The judgment in each of those cases is affirmed. The judgment in Leonard is reversed and the action remanded for further proceedings.