**Richard STAMBOUGH, Plaintiff–Appellant,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant–Appellee.**

No. 00–5836.

United States Court of Appeals, Sixth Circuit.

July 17, 2001.

Before SILER and GILMAN, Circuit Judges; DONALD, District Judge.*

OPINION

GILMAN, Circuit Judge.

Richard Stambough applied for and was denied disability insurance benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act. The district court affirmed the adverse decision by the Administrative Law Judge (ALJ). Stambough appeals that ruling, claiming that the ALJ erred in his substantive evaluation of Stambough's application for benefits. For the reasons set forth below, we AFFIRM the judgment of the district court.

---

* The Honorable Bernice B. Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

## I. BACKGROUND

### A. Factual background

Stambough was born on August 24, 1956 and is a high school graduate. From 1972 until 1992, Stambough worked steadily in a variety of positions. These jobs ranged from construction laborer and pet store employee to grocery stock boy and school custodian. He was eventually promoted to the position of head custodian at the school where he worked.

In August of 1992, Stambough strained his back while moving a large cabinet at the school. The injury was serious enough to cause him to seek emergency room treatment for pain and numbness in his lower back and right leg. After an MRI, lumbar myelogram, and a CT scan indicated the protrusion of lumbar discs, Stambough was examined by a number of orthopedists and neurologists. In December of 1992, neurosurgeon Philip Tibbs noted that Stambough had normal reflexes, excellent strength, no motor deficiency, and that his only deficit was a loss of approximately twenty degrees in forward motion. Dr. Tibbs was of the opinion that the nerve roots possibly accounting for Stambough's complaints of pain in his leg and foot were "floating freely" and not compressed. No functional restrictions were recommended, although Dr. Tibbs suggested that Stambough pursue a back rehabilitation program.

Dr. Joseph Rapier, an orthopedist, detected muscle spasm and very limited forward flexion in August 1993, but he also noted normal ankle reflexes and no significant sensory loss. Despite his recognition that Stambough could lift a maximum of twenty pounds, Dr. Rapier somewhat inconsistently limited Stambough's lifting capacity to no more than ten pounds on occasion. Dr. Rapier also determined that Stambough could stand or walk for up to three hours in an eight-hour day, could sit for up to six hours, had a limited ability to push and pull, could occasionally perform all postural activities, and needed to avoid vibrations, jars, and jolts.

Orthopedic surgeon Robert Lowe examined Stambough in December of 1993 and found that Stambough suffered from a ruptured disc with resulting radicular changes and toe extensor weakness. Dr. Lowe determined that Stambough's overall condition, however, was "not that bad," and indicated that Stambough might be exaggerating his symptoms. He stated in a deposition that Stambough should be limited to light duty activities, could potentially lift fifteen pounds, and should avoid prolonged sitting, standing, or significant jarring.

In January of 1995, Stambough was seen by neurosurgeon Philip Shields, whose examination showed few abnormalities. Dr. Shields opined, however, that in order to relieve Stambough's back pain, he would benefit from a surgical procedure known as a diskectomy. No further restrictions were listed among Dr. Shields's findings.

From December of 1994 to February of 1995, Stambough was seen on three separate occasions by Dr. Paul W. Craig, a family doctor. Although Stambough complained of back pain radiating down his legs and numbness in his toes, Dr. Craig's found equal reflexes, no gross sensory deficits, no active spasm, and no pain with leg extension in the seated position. Dr. Craig commented that Stambough's history of back pain was not consistent with the diagnostic findings and noted that Stambough was possibly exhibiting symptom exaggeration. Given the amount of time since Stambough's injury, Dr. Craig questioned whether a diskectomy would provide any benefit to Stambough. Instead, Dr. Craig prescribed pain medication and encouraged Stambough to pursue vocational rehabilitation. He also recommended

mental status counseling "if it looks like [Stambough] is going to remain chronically disabled."

In March of 1997, more than two years after his last examination of Stambough, Dr. Craig completed a residual functional capacity form for use in Stambough's application for benefits. Dr. Craig determined that Stambough could pursue work "in the sedentary to very light activity range due to his physical and emotional status." As a basis for his opinion, Dr. Craig took into consideration Stambough's subjective complaints, noting that Stambough "complains of pain with prolonged sitting or standing," that he was "poorly habilitated," and was "constitutionally and motivationally impaired."

Stambough was also examined by Drs. Rita Ratliff and Thomas Holian, both state-agency physicians. Dr. Ratliff saw Stambough on April 5, 1996. She noted that Stambough was using a cane to walk despite his normal gait and station. Her examination found no evidence to support significant activity restriction.

Dr. Holian examined Stambough on April 17, 1997. Although Dr. Holian found that Stambough had an abnormal gait, he too did not believe that Stambough's use of the cane was necessary. Dr. Holian recommended that Stambough pursue physical therapy to ease his back pain, but found no physical evidence to significantly restrict Stambough's activity.

From May 20 through September 9, 1996, Stambough sought treatment for his depression at Pathways, Inc. His treating therapists diagnosed Stambough as suffering from severe adjustment disorder (dysthymia) and determined that his Global Assessment of Functioning score was 65. This score is consistent with a mild degree of difficulty in social or occupational functioning. Stambough achieved all of his short-term and long-term mental-health goals within this five-month period. These goals included participating twice a week in an aerobics class at the YMCA. The Pathways staff did not identify any specific functional restrictions or physical limitations resulting from Stambough's complaints of pain. This was the first and only time that Stambough pursued any mental-health treatment.

In April of 1997, Dr. Edward Connor, a clinical psychologist, performed a consultative psychological examination. Dr. Connor found that Stambough tended to maximize his symptoms, including his chronic pain. He also noted that Stambough needed minimal test instruction and exhibited well organized and logical thought processes. Nonetheless, Dr. Conner concluded that Stambough exhibited dysthymia with a depressed mood and personality disorder.

The record also contains evidence of Stambough's ability to perform daily tasks. He drives his wife to work, goes shopping, and attends church on a regular basis. Moreover, he frequently visits with friends and relatives, goes fishing with his son, plays cards, and reads the newspaper. The various medical professionals who examined Stambough consistently described him as cooperative and friendly.

### B. Procedural background

Stambough applied for disability insurance benefits under Title II and SSI benefits under Title XVI of the Social Security Act, alleging a disability onset date of August 25, 1992. In May of 1995, the ALJ conducted a hearing and found Stambough "not disabled" within the meaning of the Social Security Act because there were a significant number of jobs that Stambough could perform despite his limitations. The ALJ therefore determined that Stambough was ineligible for benefits.

Stambough then appealed the ALJ's determination to the United States District

Court for the Eastern District of Kentucky. After reviewing the record, the district court remanded the case because the physical limitations cited by the ALJ to the vocational expert did not precisely track the findings of the two examining physicians upon whom the ALJ purported to rely.

On remand, the ALJ found that Stambough had "severe" impairments consisting of lumbar spine pathology, breathing difficulty, adjustment disorder (dysthymia) with depressed mood and anxiety features, an upper borderline IQ, a somatoform disorder, and a personality disorder. The ALJ determined, however, that Stambough's "subjective complaints and testimony of pain, discomfort, and mental problems were not credible." According to the ALJ, "substantial evidence in the record established that Stambough consistently displayed contradictory findings with his professed limitations or during testing."

Based in part on the testimony of the vocational expert, the ALJ then found that Stambough retained the residual functional capacity to perform jobs existing in the national economy. Stambough was therefore not under a disability as defined in the Social Security Act. *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f). After the Appeals Council declined to review the ALJ's determination, the ALJ's ruling became the final decision of the Commissioner on Stambough's application for benefits.

Stambough again sought judicial review of the Commissioner's decision. On September 9, 1999, the district court issued a Memorandum Opinion, affirming the ALJ's decision that Stambough was not disabled and granting summary judgment in favor of the Commissioner. Stambough now appeals, claiming that the ALJ applied the incorrect legal standard for evaluating his subjective complaints of pain.

## II. ANALYSIS

### A. Standard of review

Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive so long as they are supported by substantial evidence. Our review "is limited to determining whether there is substantial evidence in the record to support the findings." *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 851 (6th Cir.1986). " 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir.1981) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Furthermore, we must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

Our role is not to resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony. *See Gaffney v. Bowen,* 825 F.2d 98, 100 (6th Cir.1987) (per curiam). Instead, we focus on whether substantial evidence supports the Commissioner's decision finding Stambough not disabled and therefore ineligible for disability insurance benefits.

### B. Legal framework for disability claims

A person is considered disabled under the Social Security Act "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore,

an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden lies with the claimant to prove that he is disabled. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir.1993); *see also* 20 C.F.R. § 416.912(a).

The regulations outline a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520. First, an individual who is working and engaged in substantial gainful activity will not be considered "disabled" regardless of medical findings. *See* 20 C.F.R. § 404.1520(b). Second, an individual who does not have a "severe impairment" will not be found "disabled." *See* 20 C.F.R. § 404.1520(c). Third, if an individual is not working and is suffering from a severe impairment that meets the durational requirement and "meets or equals a listed impairment," a finding of "disabled" will be made without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d). Fourth, if the Commissioner finds that an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e). Finally, if an individual's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. *See* 20 C.F.R. § 404.1520(f). The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work. *See Tyra v. Sec'y of Health and Human Servs.*, 896 F.2d 1024, 1028 (6th Cir.1990).

In the present case, the ALJ's findings progressed through step five. None of the earlier steps proved dispositive. Stambough thus established a prima facie case of disability, and the burden shifted to the Commissioner to introduce substantial evidence showing the existence of other jobs that he could perform given his residual functional capacity, age, and vocational factors.

According to the vocational expert, Stambough could perform 40 to 50 percent of the 200 sedentary unskilled jobs recognized by the Commissioner under the Medical–Vocational Guidelines. The vocational expert based this determination on Stambough's age, education, past relevant work experience, and ability to perform a limited range of sedentary work as set forth in the ALJ's choice of hypothetical factors mirroring Stambough's medical condition. These factors were consistent with the opinions of Drs. Rapier and Lowe, and more generous than warranted by Drs. Ratliff and Holian. Moreover, the ALJ gave Stambough the benefit of the doubt in adopting many of Dr. Craig's nonexertional restrictions that were partially based on Stambough's subjective complaints of pain. All of the above constitutes substantial evidence supporting the Commissioner's determination that Stambough retained the residual functional capacity for sedentary work.

C. The ALJ applied the proper legal standard in evaluating Stambough's subjective complaints of pain

Stambough seeks to avoid the above conclusion by claiming that his mental impairments made his pain "more severe." Accordingly, Stambough argues

that the ALJ failed to apply the proper standard in evaluating his subjective complaints of pain. This court has set out a two-pronged analysis to be used by an ALJ in evaluating subjective complaints of pain in Social Security disability cases. *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). First, the ALJ must determine whether there is objective medical evidence of an underlying medical condition. *See id.* If such objective medical evidence exists, then the ALJ must ask if the evidence confirms the severity of the alleged pain, or if the objectively established medical condition is so severe that it can reasonably be expected to produce the alleged pain. *See id.* The administrative regulations to the Social Security Act set out reliable indicators of pain that the ALJ should consider in determining whether a claimant's alleged pain is disabling. *See* 20 C.F.R. § 404.1529 (describing how an ALJ evaluates symptoms of alleged disability, including pain).

Here, the ALJ found that objective medical evidence established that Stambough suffered from "severe" impairments consisting of lumbar spine pathology, breathing difficulty, adjustment disorder (dysthymia) with depressed mood and anxiety features, an upper borderline IQ, a somatoform disorder, and a personality disorder. Stambough therefore satisfied the first prong of the *Duncan* standard.

The ALJ, however, found no objective evidence confirming the severity of Stambough's alleged pain. Specifically, the ALJ questioned the credibility of Stambough's claims of incapacitating pain in light of the medical evidence and Stambough's daily activities. Almost all of Stambough's treating and examining physicians noted that he tended to magnify his symptoms. Stambough also delayed seeking treatment for a mental disorder until 1996, and then was able to achieve all of his mental-health goals within a five-month period. Dr. Connor, the psychologist who most recently examined Stambough in April of 1997, found Stambough to be cooperative, friendly, and appropriately dressed. Moreover, Stambough maintained the ability to interact with others despite his professed pain, discomfort, and mental problems. Stambough's treating physician, Dr. Craig was of the opinion that Stambough could pursue a more active lifestyle and rehabilitation. In light of this evidence, the ALJ was justified in concluding that Stambough's subjective statements concerning his pain were not fully credible. Stambough therefore failed to satisfy the second prong of the *Duncan* standard.

The district court did not err in affirming the ALJ's decision. As the district court pointed out, the ALJ evaluated the severity of Stambough's medical condition as well as the objective medical indicators of pain, the medical and vocational reports, and Stambough's daily activities. These factors, as well as the deference properly accorded to the ALJ's credibility determinations, warranted the conclusion that Stambough was not disabled under the Social Security Act. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir.1987) ("[W]e will not normally substitute our impressions on the veracity of a witness for those of the trier of fact.").

## III.  CONCLUSION

For all of the reasons set forth above, we AFFIRM the judgment of the district court.