762 F.2d 1005
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ROBERT L. ANDERSON, PLAINTIFF-APPELLANT,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, DEFENDANT-APPELLEE.
 NO. 84-5589
 United States Court of Appeals, Sixth Circuit.
 4/23/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE
 BEFORE: JONES and WELLFORD, Circuit Judges; and BROWN, Senior Circuit Judge.
 Per Curiam.
 
 
 1
 Robert Anderson appeals the district court's order, which on cross-motions for summary judgment denied social security disability and supplemental security income benefits. Anderson challenges the Secretary's decision as well as the validity of the sequential analysis employed by the Secretary. Upon consideration of the issues presented, we affirm.
 
 
 2
 Anderson, was born on January 21, 1945. He has a ninth grade education. Amongst other types of employment, Anderson has been a logger, coal truck driver, dozer operator, and card machine operator. His last job was as a laborer. He suffers from a cough, shortness of breath, difficulty in sleeping, pain in his back, arms, and legs, depression, and a hearing loss.
 
 
 3
 Because of those conditions Anderson filed several applications for disability benefits and for supplemental security income benefits. In the applications that are presently before this Court, Anderson alleged disability due to heart trouble, shortness of breath, and impaired hearing. His applications were denied both initially, on reconsideration, by an ALJ, and by the Secretary. The district court found that the Secretary's decision was supported by substantial evidence. Anderson, therefore, appeals.
 
 
 4
 Appellate review of the Secretary's decision to deny social security disability and supplemental security income benefits is limited to determining whether there exists substantial evidence on the record, as a whole, to support findings that Anderson is not disabled within the meaning of the Social Security Act. See Richardson v. Perales, 402 U.S. 389 (1971); Kirk v. Secretary of Health and Human Services, 667 F.2d 524 (6th Cir. 1981), cert. denied, ---- U.S. ----, 103 S.Ct. 2428 (1983); 42 U.S.C. Sec. 405(g) (judicial review of Title II decision requires substantial evidence); 42 U.S.C. Sec. 1383(c)(3) (judicial review of Title XVI decision is subject to same scope of review as Title II decision). Substantial evidence exists when there is 'more than a mere scintilla [of evidence]. [That is, substantial evidence] . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consolidated Edision Co. v. NLRB, 305 U.S. 197, 229 (1938)).
 
 
 5
 The ALJ determined that Anderson's only impairment was hypocondriasis. The ALJ concluded that Anderson's hypochondriasis was not severe within the meaning of 20 C.F.R. Secs. 404.1521 and 416.920(c). As a result, the ALJ further concluded that Anderson was not disabled within the meaning of the Act.
 
 
 6
 On appeal to the district court, Anderson contended that 20 C.F.R. Sec. 404.1520(c) was invalid because a finding of non-severity terminates the sequential consideration of a disability claim. Termination, according to Anderson, made the regulations contrary to the Act. The district court relied upon Mowery v. Heckler, No. 83-567 (E.D. Tenn., Feb. 27, 1984) (unpublished) and disagreed.
 
 
 7
 On appeal to us, Anderson informs us that Mowery is presently under consideration by this Court. Assuming that Sec. 404.1520(c) is valid, Anderson argues that the Secretary failed to consider the combined affect of his hearing problems, heart problems, mental retardation, and hypochondriasis. Anderson's appeal to this Court, therefore, presents two issues: (1) whether the sequential analysis provided in the social security regulations is contrary to the Social Security Act; (2) whether there exists substantial evidence on the record as a whole to support the Secretary's decision?
 
 Social Security Regulations
 
 8
 The briefs submitted by appellants in Mowery No. 84-5312 (undecided) (argued on January 25, 1985) raises the question whether the 'Secretary's non-severe impairment regulations (20 C.F.R. Secs. 404.1520(c), 404.1521) are invalid because they conflict with 42 U.S.C. Sec. 423(d)(1), (2), (3) by allowing denial of disability benefits to individuals who have a medically determinable physical or mental impairment which results in inability to engage in substantial gainful activity.' Mowery has not been decided. Nevertheless, our review of the regulations is limited to determining whether they exceeded the Secretary's statutory authority and whether they are arbitrary and capricious. In Gist v. Secretary of Health and Human Services, 736 F.2d 352, 357 (6th Cir. 1984) we explicitly stated that the regulations do not exceed the Secretary's authority and are neither arbitrary nor capricious. Based upon Gist we now affirm the district's court's opinion.
 
 Substantial Evidence
 
 9
 The record reveals that on April 18, 1980 Dr. Samuel O. Massey, Jr., noted that Anderson had a severe sensori-neural hearing loss. As a result, Dr. Massey recommended that Anderson have surgery in order to restore as much of his hearing as possible. Massey opined that because his hearing loss was due to a nerve loss, Anderson would have to wear a hearing aid to obtain 'good' hearing. Surgery, therefore, was recommended primarily to provide a safer ear.
 
 
 10
 On May 29, 1980, Dr. Roy Upton examined Anderson and opined that he had atypical chest pain accompanied by a normal EKG. Dr. Upton could not find evidence of major cardiovascular complication or of coronary artery disease. Dr. Upton did notice, however, that Anderson had decreased hearing to conversation at six feet, but that his hearing loss required a definitive evaluation. Dr. Upton further opined that based upon physical abilities, other than hearing, Anderson could engage in moderate physical activities on a substantial basis.
 
 
 11
 On January 23, 1976, Dr. A. J. Ahler opined that Anderson's heart and lungs were normal. On May 4, 1976, Dr. Daniel Davis diagnosed mild chronic obstructive bronchopulmonary disease and noted that there was no cardiac enlargement or palpable thrills, that his cardiac tones were of fair quality, that he had normal sinus rhythm, and that there was a systolic murmur at the mitral area. Dr. Davis also diagnosed syncope with an undetermined etology, endentulous, lower jaw, and moderate obesity exogenus. Dr. Davis further diagnosed chronic otitis media, with hearing ear for conversational voice in the right ear at 0/15 and in the left ear at 15/15.
 
 
 12
 On April 23, 1976, M.A. Fry, Jr., Radiologist, noted a negative examination radiographically of the chest.
 
 
 13
 On May 21, 1976, Dr. John Purvis believed that Anderson probably had syncope but ruled out seizure. On May 24, 1976, Dr. Purvis noted that Anderson's neurologic examination was normal. On June 4, 1976, Dr. Purvis noted that Anderson had normal response to photic stimulation and no changes in hyperventilation and that his EEG was normal.
 
 
 14
 An examination by C. Nicholas Caster of the Tennessee Department of Welfare reveals that Anderson's nose, throat, and lungs were clear. Anderson's nervous system, genito-urinary system, circulatory system, eyes, and breasts were normal. His left ear, however, was perforated. According to Dr. Castler, Anderson was in excellent health and was not limited in terms of walking, standing, stooping, bending, climbing, lifting, reaching, pushing, or pulling.
 
 
 15
 On June 6, 1981, Dr. Sarada Misra examined Anderson and diagnosed chronic otitis media with a significant hearing loss that was corrected to some degree by a hearing aid on the left ear. Dr. Misra also diagnosed mild chronic obstructive pulmonary disease. Dr. Misra further diagnosed valvular heart disease but ruled out mild aortic stenosis and I.H.S.S.. Dr. Misra noted that Anderson's EKG showed nonspecific ST T changes. On October 27, 1981, Misra had made essentially the same diagnosis, however, then she also diagnosed that Anderson's historical hypertension was normal.
 
 
 16
 On June 5, 1981, Dr. Clifford Walton stated that Anderson had a normal chest. On October 22, 1981, Dr. Walton noted that Anderson's chest had not changed significantly.
 
 
 17
 Progress notes from the Veterans Administration Hospital covering the period from February 23, 1982 until June 17, 1982 stated that Anderson had atypical chest pain and an occasional pain that radiated down his neck. The notes also identified Anderson's old lung defect but stated that his lungs were clear. The notes also stated that Anderson had almost no hearing in his right ear. In those notes, Dr. Lewis Howard noted that Anderson needed ear surgery and ruled out ASHD-Vascular disease.
 
 
 18
 In those progress notes, Dr. Lakshmanan stated that despite his poor inspiratory effort, Anderson's lungs showed no evidence of active infiltration. Dr. Laskshmanan also noted that considering Anderson's poor inspiratory effort his cardiac size was probably unremarkable. Dr. Laskshmanan further noted that his pulmonary vascularity showed no significant findings. Dr. Laskshmanan concluded that Anderson did not have an active disease.
 
 
 19
 In June of 1978, Dr. G. Harston noted that Anderson's echocardiogram revealed no definite abnormalities. As a result, Dr. Harston concluded that Anderson was probably normal. However, Dr. Harston also noted that the echocardiogram was technically limited.
 
 
 20
 Dr. Jennings noted that Anderson had early repolarization but that it probably was within normal limits.
 
 
 21
 A second set of records from the Veteran's Administration Hospital covering the period from March 15, 1982 until July 31, 1982 indicates that on July 31, 1982, Dr. Joan Woods, M.D., made three diagnoses: (1) hypochondriasis, (2) borderline mental retardation and passive-dependent personailty, and (3) decreased hearing with a four per cent loss in the right ear and an eight per cent loss in the left ear. On July 9, 1982, Dr. R. E. Green noted five impressions: (1) incipient pilonidal sinus, (2) deafness in both ears with the left ear being worse than the right, (3) obesity, (4) angina pectoris, and (5) periodic transient mechanical low back strain that was probably confined to the SI joints. On July 7, 1982, Dr. Suresh Saraswt noted that Anderson's historical hypertension was under control and that he had arterioscleorotic heart disease with possible angina.
 
 
 22
 Dr. Dee Antony gave Anderson an otoscopic examination and discovered that he had a perforation in the left ear and a small perforation in the right eardrum. According to Dr. Antony, Anderson's hearing loss would affect him slightly if there is competing noise or environmental distraction. Dr. Antony also opined that Anderson used his hearing loss as a more severe problem than what it actually was.
 
 
 23
 On July 8, 1982, Dr. Tarleton, Jr., noted that Anderson's lumbrosacral spine was negative except for a very minimal sclerosis of the articular facets between L5 and S1 on both sides. On July 6, 1982, Dr. Edwin Mitchell noted that Anderson's sinuses were normally aerated, that his skull exhibited no sign of increased pressure or other pathology, and that he had a negative echoencephalogram. On July 1, 1982, Dr. Tarleton noted that Anderson's chest was fine except for minimal fibro-calcific scarring on the right upper lobe due to remote granulomatous disease.
 
 
 24
 A psychological evaluation by Dr. Dennis Carringer stated that the Wechsler Adult Intelligence Scale revealed that Anderson was in the borderline range of intelligence. Dr. Carringer, however, estimated Anderson's functional potential to be in the dull, normal range of intellect. Anderson scored a mental age of ten years, six months, and an IQ of 80 on the Draw-A-Person Test. On the Bender Gestalt Test Anderson displayed very good perceptual motor skills with slightly less than normal intellectual functioning and displayed no problems in judgment or planning ability in terms of efficient or effective task execution. Anderson's Rorschach Ink-Blot Technique Test revealed a good deal of thought constriction and poverty of content.
 
 
 25
 Dr. Carringer concluded that Anderson's markedly restricted daily activities and interest patterns were self-imposed. Dr. Carringer also concluded that Anderson had the ability to understand simple one and two step instructions and to carry out those instructions under ordinary supervision. Dr. Carringer further concluded that Anderson had the ability to sustain work performance over an eight hour day and to function in an ordinary, unskilled, competitive work setting. In that setting, Dr. Carringer believed, Anderson's ability to meet quality and performance standards was restricted to the degree that he had definitively diagnosed hearing loss plus some obvious self-imposed inability to deal with situational stress and to show an adequate level of frustrational tolerance. Consequently, Dr. Carringer's prognosis was guarded.
 
 
 26
 We believe that substantial medical evidence reveals that Anderson's impairments include hypochondriasis and a hearing loss. The ALJ's conclusion that he suffers only from hypochondriasis is erroneous. Despite that error substantial medical evidence reveals that Andersons two impairments, whether considered together or singularly, are not severe within the meaning of the regulations. Instead, as Dr. Carringer noted it is only Anderson's attitude of self-imposed invalidism that keeps him from being employed.
 
 
 27
 Accordingly, we AFFIRM the order of the district court.