818 F.2d 31
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Billy J. PIERCE, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 86-5821.
 United States Court of Appeals, Sixth Circuit.
 May 14, 1987.
 
 Before MARTIN and MILBURN, Circuit Judges, and ALDRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Claimant Billy J. Pierce appeals from the judgment of the district court denying his application for disability insurance benefits and supplemental security income. Because we conclude that the Secretary's decision is based on substantial evidence, we affirm.
 
 I.
 
 2
 Claimant Billy J. Pierce filed applications for a period of disability, disability insurance benefits, and supplemental security income on March 6, 1985. His application was denied initially and upon reconsideration. A de novo hearing was held before an Administrative Law Judge on October 7, 1985. On October 24, 1985, the ALJ denied the claim on the ground that, although claimant was unable to perform his past work as a heavy equipment mechanic, he did retain the residual functional capacity to perform light and sedentary work. On December 24, 1985, the Appeals Council denied review.
 
 
 3
 Claimant subsequently initiated the present action. On December 24, 1985, the district court affirmed the denial of benefits, concluding that the ALJ's decision was supported by substantial evidence.
 
 
 4
 Claimant was born on November 16, 1935, and was 49 years old at the time of the administrative hearing. He has a ninth-grade education, and last worked on February 26, 1985, as a heavy equipment mechanic for Elkhorn Stone company. He alleges disability commencing February 28, 1985, due to cardiac and respiratory impairments. Claimant had a myocardial infarction in July 1984, and quadruple bypass surgery in August 1984. lie returned to work in October 1984, but quit in February 1985, because he was required to return to heavy labor.
 
 
 5
 On November 13, 1980, claimant was examined by D.-. Robert W. Penman of the pulmonary medicine department of Bethesda Hospital in Cincinnati. Dr. Penman noted that claimant had spent most of his career in a coal mine, loading coal or operating a scoop.[1] Claimant complained of shortness of breath which bothered him upon any exertion greater than walking at a normal pace. He noted that claimant had occasional wheezing but no chest pain. He had a cough productive of copious sputum.
 
 
 6
 Dr. Penman indicated that claimant's breath sounds were normal; there were no wheezes or rhonchi. Cardiovascular system was normal, and blood pressure was 125/85. The chest X-ray showed fine nodulation in all regions of the lungs consistent with pneumoconiosis stage two. Pulmonary function tests showed no abnormality. Vital capacity and expiratory flow were normal. Dr. Periman concluded that "there is an adequate history of exposure to coal mine dust and X-ray change for a diagnosis of coal workers' pneumoconiosis stage two. Lung function is not impaired on these tests." Joint App. at 126.
 
 
 7
 On July 12, 1984, claimant was admitted to Methodist Hospital of Pikeville, Kentucky, complaining of chest pain, nausea, dyspnea, and diaphoresis. Claimant's treating physician, Dr. Ronald Mann, gave a diagnosis of anteroseptal myocardial infarction. Joint App. at 129. Dr. A. malik, a consultative physician, agreed with this diagnosis. Joint App. at 132.
 
 
 8
 A chest X-ray on July 12, 1984, showed pulmonary vasculature within normal limits. There was a streaky density in the left lower lung representing a possible atelectasis. The rest of the lung fields appeared essentially clear. Dr. Kim, the radiologist, indicated that there was no active infiltration or pleural effusions bilaterally. His impression was moderate cardiomegaly and probable plate-like atelectasis in the left lower lung. Joint App. at 143.
 
 
 9
 The X-ray was repeated on July 13, and Dr. Kim noted that the pulmonary vasculature remained within normal limits. Id. at 144. The previously noted small streaky density in the left upper lower lung was no longer identified; however, a new horizontal streaky density was identified. Id. Once again there was no active infiltration or consolidation. A lung scan conducted July 16, 1984, showed no evidence of pulmonary emboli. Id. at 146. A chest X-ray of July 21, 1984, showed the atelectasis in the left lung base was no longer identified. Id. at 127.
 
 
 10
 Claimant was discharged on July 21, 1984, but was readmitted July 26 and was diagnosed as suffering from unstable angina. He was discharged on July 28, 1984, to be seen and evaluated as an outpatient with possible cardiac catheterization. He was readmitted July 30, 1984, and discharged August 2, 1984, again suffering from unstable angina. At that time, he was transferred to St. Joseph's Hospital for cardiac catheterization. Joint App. at 168.
 
 
 11
 On August 2, 1984, claimant was admitted to St. Joseph's Hospital. He began intensive therapy, but continued to have episodes of chest pain requiring nitroglycerin. In light of the severe nature of his cardiac disorder and the fact that claimant suffered persistent rest angina in the hospital, it was recommended that he undergo coronary artery bypass surgery. Joint App. at 174-75.
 
 
 12
 Dr. Stahmann performed the surgery on August 10 and claimant's postoperative course was uncomplicated with rapid improvement on the cardiac rehabilitation program. Dr. Sartini, who was claimant's treating physician for his cardiac disorder, indicated that "he did extremely well from his surgery." Id. at 174. Dr. Sartini was disheartened to see that claimant continued to smoke throughout his hospital stay in spite of the discussion concerning this problem. Id. at 188. Claimant was discharged on August 17, 1984. The discharge diagnosis was coronary artery disease, unstable angina pectoris, and an old myocardial infarction. Id. at 174.
 
 
 13
 On August 2, 1984, another chest X-ray was performed. No acute cardiopulmonary disease was evident, and claimant's lungs were clear.
 
 
 14
 On August 21, 1984, Dr. Sartini corresponded with Dr. Mann on the subject of claimant's heart surgery. He indicated that claimant's blood pressure upon admission to St. Joseph's Hospital was 120/60, his chest was clear, and the cardiac examination was unremarkable. He summarized the operative procedure, and repeated his conclusion that claimant's postoperative course was uncomplicated and that claimant improved rapidly. He expressed displeasure at claimant's insistence upon continuing to smoke, and indicated that he was not hopeful that claimant would be willing to stop. Joint App. at 188.
 
 
 15
 On September 21, 1984, Dr. Sartini reported that claimant was "doing extremely well with no chest pain and improving and ambulating nicely." Dr. Sartini's examination revealed a blood pressure of 140/80 with a pulse rate of 70. His chest was clear and cardiac examination was unremarkable. Joint App. at 190.
 
 
 16
 On October 29, 1984, Dr. Sartini corresponded with Dr. Mann regarding the results of a stress test performed on claimant eight weeks following bypass surgery. Dr. Sartini indicated that claimant was able to exercise for, 6 1/2 minutes, and that he exceeded 85 percent of predicted maximum heart rate, experienced no chest pain, and no ischemic ST segment changes were noted. He indicated that "Mr. Pierce continues to do reasonably well following bypass surgery, and I feel that he can return to employment without restriction in one additional month." Joint Appendix at 197.
 
 
 17
 On March 22, 1985, claimant was examined by Dr. Penman regarding his respiratory impairment. Dr. Penman indicated that claimant complained of shortness of breath, and that he had difficulty walking up hills and stairs. claimant complained of wheezing and some cough, mainly in the morning. Dr. Penman indicated that claimant's chest moved well with respiration, breath sounds were normal, there were no wheezes or rhonchi, and that his cardiovascular system was normal. Claimant's blood pressure was 125/85.
 
 
 18
 A chest X-ray indicated fine nodulation in the lower and mid zones of both lungs consistent with pneumoconiosis or silicosis stage one. Spirometry showed no abnormality, but an arterial blood gas study showed hypoxia. Dr. Penman concluded that there was an adequate history of exposure to silica dust and X-ray change for a diagnosis of silicosis stage one. He indicated that lung function was impaired, but he did not indicate the extent of this impairment. Joint App. at 198.
 
 
 19
 The record contains residual functional capacity assessments completed on June 13 and April 3, 1985. Joint App. at 121-25. Both physicians indicated that claimant could perform medium work, although both placed some restrictions on heavy and prolonged pushing and pulling and temperature extremes. These restrictions are not imposed by claimant's treating physicians.
 
 
 20
 On June 7, 1985, claimant was examined by Dr. V. D. Modi at the Miner's Medical Clinic. Dr. Modi indicated that claimant's primary medical complaints were shortness of breath, swelling and pain in the feet and legs, tiredness, chest pain, and numbness in the arms. He noted that claimant had a history of coughing up phlegm and of wheezing on exertion. He indicated that claimant continued to smoke a pack of cigarettes per day. Although claimant complained of chest pain, he had no history of high blood pressure. Claimant complained of back problems and of trouple sleeping. He indicated that claimant was taking Persantine and Ascripton. Claimant's blood pressure was within normal limits.
 
 
 21
 Chest examination showed that the movement of claimant's chest was bilateral, equal and symmetrical. Palpitation of the chest was unremarkable, and percussion of chest was within normal limits. Dr. Modi indicated that auscultatory sounds showed occasional rhonchi at both bases. Heart examination showed no murmurs, no PVCs, and no gallops. Spine examination showed stiffness on movement with a normal range of motion. Dr. modi concluded that claimant was suffering from coronary artery disease and occasional angina-type pains relieved by rest without medication. He indicated that claimant suffered from shortness of breath, although he had a normal spirometry. Joint App. at 200-03.
 
 
 22
 A radiology report dated May 29, 1985, showed a normal heart size, no pleural fluid and no pneumonia. The impression was no active pulmonary disease, previous sternal splitting thoracotomy, and chronic obstructive pulmonary disease. Joint App. at 204.
 
 
 23
 A pulmonary function study was performed on May 29, 1985. Prebronchodilator data showed FVC mildly reduced, no significant expirary obstruction, MVV mildly reduced. Postbronchodilator data showed the FVC within normal limits, a mild expiratory obstruction, and MVV mildly reduced. Joint App. at 205-08.
 
 
 24
 On July 3, 1985, claimant was examined by Dr. John E. Myers at the request of his attorney. Joint App. at 221-24. Dr. Myers' diagnosis was arteriosclerotic heart disease, chronic obstructive pulmonary disease, radiographic changes compatible with early silicosis, mild restrictive and moderate obstructive defects in ventilation, functional class II. Dr. Myers indicated that "this man's silicosis, if it is silicosis, results from his entire exposure history to rock dust during his work career." He indicated that claimant's pulmonary condition restricted arduous manual labor to some extent. He stated that claimant's chief complaint was shortness of breath. Although claimant had no history of high blood pressure, his blood pressure was elevated on the day of Dr. Myers' examination; his blood pressure was 180/98 in the left and 140/84 in the right arm.
 
 
 25
 Dr. Myers indicated that claimant's air exchange was somewhat impaired, heart size and sounds were normal and that there were no gallops or murmurs. He indicated that claimant's back was normal and neurologic exam was normal. Chest X-rays showed minimal micronodular changes which could be secondary to silicosis. Ventilation studies showed mild restrictive and obstructive defects in ventilation. Dr. myers concluded:
 
 
 26
 This patient's cardiovascular problem is his major one, and restricts arduous manual labor, probably permanently. with his family history and course to date, and cardiomegaly, and hypertension, his prognosis is not good. He would probably meet the criteria for social security disability in that respect. His early changes suggest silicosis by X-ray, despite a history of no coal mining, but considerable history of rock dust exposure. If this results from his rock dust exposure, it results from his entire exposure. His pulmonary condition would appear to limit somewhat arduous manual labor.
 
 
 27
 At the administrative hearing, claimant testified that he could no longer perform the heavy work associated with his employment at Elkhorn Stone. He indicated that when he attempted to do the work, he felt that something was pulling apart in his chest. Joint App. at 31. He testified that his respiratory problems are more significant during cold weather and that he wakes up during the night coughing and wheezing. He indicated that he suffers from shortness of breath whenever he has to go up steps or hills and that, even if he were not suffering from heart disease, his respiratory impairment would preclude him from working. He further indicated that his respiratory impairment forced him to stop hunting, but that he still goes fishing occasionally. He does a limited amount of walking and visits friends and relatives, but his son has assumed all of the family's yard work.
 
 
 28
 Claimant testified that he could probably lift 100 or 150 pounds, but could not lift 25 pounds on a sustained basis. He indicated that he could walk a quarter of a mile on level ground. He is able to dress himself and do, a minimal amount of work around the house, and he also helps his wife carry groceries. Claimant testified that he continues to smoke about one-half pack of cigarettes a day.
 
 
 29
 At the administrative hearing, the ALJ also took testimony from a vocational expert. The vocational expert indicated that claimant's work is skilled, and that he has skills that are transferable to work on smaller automotive vehicles. She indicated that people who do work on heavy equipment also learn to plan their work and use technical manuals and charts. They also learn to use certain tools. The ALJ propounded the following hypothetical to the vocational expert:
 
 
 30
 Now Ms. Jones hypothetically considering an individual whose age is 49 with the education, training and work experience in the present case and assuming that I should find that this person has suffered a myocardial infarction in July 1984 followed by and is now status post-open heart surgery as in the present case of four arteries, such person did return to work as in the present case October '84 and worked until February, almost the end of February 1985 as in the present case, such person has artericsclerotic heart disease with a history of unstable angina pectora, such person has occasional angina relieved without medication but by rest, such person has chronic obstructive pulmonary disease, category one silicosis, mild restrictive--tory defect as a result of the heart disease INAUDIBLE--is shortness of breath on exertion, such person has fatigue that goes with that, medications as in the present case, then I would ask you if there is any work such a person could perform on a sustained basis in your judgment.
 
 
 31
 Joint App. at 49-50. The vocational expert replied that "first of all such a person could not continue in work such as he was doing .... However, it is my opinion that with these conditions he would not be able to work at any type of mechanic's work and I cannot name any work that he could perform under circumstances." Joint App. at 50.
 
 
 32
 The ALJ summarized claimant's medical history. She concluded that, although claimant's heart impairment constituted a severe impairment, his complaints of chest pain were not entirely credible because they are inconsistent with the medical evidence if record. She stated that the evaluations performed by Dr. Sartini indicated that claimant was capable of performing some work. She further stated that claimant's respiratory impairment was only mild. This conclusion was based upon repeated diagnoses of category one impairments.
 
 
 33
 The ALJ refused to rely on the testimony of the vocational expert on the ground that her "conclusion was premised upon the existence of minimal exertion producing a good deal of angina, pain, discomfort, and claimant's testimony concerning respiratory distress, none of which is in any way supported by the medical evidence of record." She concluded that, although claimant is unable to return to his past work, he does retain the residual functional capacity to perform sedentary and light work.
 
 
 34
 Because claimant does suffer from a nonexertional respiratory impairment.2n,theALJdid not rely on the grid to dictate a conclusion. Rather, she concluded that claimant's respiratory impairment did not significantly limit his exertional capability. Accordingly, using the grid as a framework for decision making, she concluded that the claimant was not disabled.
 
 
 35
 The district court concluded that this decision was supported by substantial evidence. On appeal, claimant contends that the Secretary improperly referred to the grid and ignored the testimony of the vocational expert. He argues that the Secretary has failed to meet his burden at step 5 and that benefits should be awarded.
 
 II.
 A.
 
 36
 Claimant argues that reference to the grid was inappropriate because a vocational expert testified at the administrative hearing. This contention is without merit. The Secretary may meet his burden of establishing the existence of available jobs in the national economy by use of the grid. See, e.g., Kimbrough v. Secretary of Health & Human Services, 801 F.2d 794 (6th Cir. 1986) (per curiam); Beecher v. Heckler, 756 F.2d 693, 695 n.2 (9th Cir. 1985); Jones v. Heckler, 702 F.2d 616, 622-23 (5th Cir. 1983); Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 528-29 (6th Cir. 1981), cert. denied, 461 U.S. 957 (1983). "Some disability determinations can be made on the basis of guidelines developed by the Social Security Administration without the aid of vocational testimony.... Only if a claimant cannot perform substantially all of the activities in a given category of exertional requirements must an ALJ solicit vocational testimony." Carter v. Heckler, 712 F.2d 137, 142 (5th Cir. 1983) (citation omitted, emphasis supplied).
 
 
 37
 We decline to adopt a rule that would have the practical effect of discouraging an administrative law judge from calling a vocational expert in those cases which ultimately may not require such testimony. We believe that such a rule is neither compelled by the Act nor advisable as a matter of policy. Cf. Borrero Lebron v. Secretary of Health & Human Services, 747 F.2d 818 (1st Cir. 1984) (per curiam) (upholding use of grid even though vocational expert testified at the hearing).
 
 B.
 
 38
 Claimant's second argument is that use of the grid as a framework for decision making was inappropriate because he suffers from a nonexertional respiratory impairment. The grid is not fully applicable when a claimant suffers from a combination of exertional and nonexertional impairments.
 
 
 39
 [w]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, [e.g., mental, sensory or skin impairments] the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule (s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capabilit," is further diminished in terms of any types of jobs that could be contraindicated by the nonexertional limitations.
 
 
 40
 Kirk, 667 F.2d at 528 (quoting 20 C.F.R. Subpart P, Appendix II, Sec. 200.00 (e) (1981)). See also Damron v. Secretary of Health & Human Services, 778 F.2d 279, 282 (6th Cir. 1985).
 
 
 41
 When a claimant suffers from a nonexertional impairment, the Secretary may not rely on the grid unless the nonexertional impairment does not significantly diminish his ability to perform a full range of work at the designated level. See Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986); Kimbrough, 801 F.2d at 796-97; Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam) ; Kirk, 667 F.2d at 536-37. "By use of the phrase 'significantly diminish' we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 606.
 
 
 42
 In the present case, the ALJ concluded that claimant's nonexertional impairment does not significantly limit his ability to work at the desigriated level, and that as a consequence application of the grid as a framework for analysis was proper. "whether a given nonexertional condition affects a particular claimant's residual capacity to engage in certain job activities is a question of fact." Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984) (per curiam); Cummins v. Schweiker, 670 F.2d 81, 84 (7th Cir. 1982) . Therefore, if the Secretary's resolution of this issue is supported by substantial evidence, it must be upheld.
 
 
 43
 In determining whether the claimant's nonexertional limitations significantly limit his ability to work at the designated level, the testimony of a vocational specialist is not necessary. Bapp, 802 F.2d at 606; Warmoth v. Bowen, 798 F.2d 1109, 1112 (7th Cir. 1986) (per curiam) . "[R]ather, we only require that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." id.
 
 
 44
 Appellate courts have frequently upheld administrative decisions based on the conclusion that a nonexertional impairment did not significantly limit exertional capabilities when the medical evidence established that the nonexertional limitation was mild. For example, in Tucker v. Heckler, 776 F.2d 793 (8th Cir. 1985), the claimant alleged disability on grounds of arthritis, a psychological disability, shortness of breath, and pain. The ALJ concluded that claimant's arthritis constituted a severe impairment, but that he retained the exertional capacity to perform light work. The ALJ further concluded that his nonexertional impairments "did not further compromise Tucker's exertional capability." id. at 795. The ALJ therefore referred to the grid and concluded that Tucker was not disabled.
 
 The Eighth Circuit affirmed, noting that:
 
 45
 the ALJ thoroughly considered Tucker's nonexertional impairments and explicitly determined that they did not diminish .Tucker's exertional capabilities. Because substantial evidence in the record as a whole supports the ALJ's conclusion, his failure to call a vocational expert did not constitute reversible error in this case.... For the same reason, the ALJ did not err in referring to the Guidelines to determine that Tucker was not disabled.
 
 
 46
 Id. at 796 (citations omitted). The substantial evidence supporting the ALJ's decision on this issue was the reports of psychological consultants, none of whom expressed an opinion "that Tucker's mental impairments imposed more than a mild impediment, if any, to Tucker's performance of work-related activities." Id. at 795.
 
 
 47
 Similarly, in Borrero Lebron, 747 F.2d at 819, claimant alleged that she suffered from anxiety neurosis. The only evidence supporting the allegation was the report of a physician who saw her only once and indicated that her impairment was only, moderate. The Appeals Council rejected the ALJ's finding of disability and concluded that claimant's moderate impairment did not affect her ability to perform light work, "and considering that capacity within the framework of the [grid], the claimant is found 'not disabled' ...." Id. at 819. This decision was affirmed on :the ground that substantial evidence supported the conclusion that the impairment was not significant and that use of the grid was not erroneous. Id. at 819-20.
 
 
 48
 Finally, in Hernandez v. Heckler, 704 F.2d 857 (5th Cir. 1983), the claimant alleged that his exertional capabilities were limited by nonexertional impairments including a sensory limitation, a manipulative limitation, an emotional impairment, and pain. Id. at 861. The ALJ concluded that these impairments did not limit his ability to perform sedentary work. Id. at 862. The court concluded that this finding was supported by substantial evidence in the form of physician's reports indicating the absence of a manipulative or sensory impairment and the existence of only a mild emotional impairment. Id. at 862-63. Accordingly, the court held that use of the grid was proper. Id. at 863. See also Kimbrough, 801 F.2d at 796-97 ("minor nonexertional impairment" is insufficient to preclude application of the grid); Razey v. Heckler, 785 F.2d 1426, 1430, amended, 794 F.2d 1348 (9th Cir. 1986) (use of grid upheld when alleged emotional disorder "did not so affect [claimant's] residual capacity that the use of the grids was inappropriate."); Nelson v. Secretary of Health & Human Services, 770 F.2d 682, 685 (7th Cir. 1985) (per curiam) (use of grid was proper when no medical evidence indicated that nonexertional impairment was significant); Cummins, 670 F.2d at 84 (use of grid appropriate despite existence of vision impairment when the impairment had not affected claimant's ability to work in the past). Cf. Bapp, 802 F.2d at 605-06 (use of grid inappropriate when ALJ failed to consider extent to which nonexertional impairments limited claimant's ability to perform a full range of light work); Warmoth, 798 F.2d at 1112-13 (use of grid inappropriate when ALJ failed to give adequate consideration to severe environmental restrictions).
 
 
 49
 In the present case, the ALJ fully considered claimant's nonexertional respiratory impairment and its effect upon his ability to perform the full range of work at the designated level. Because substantial evidence supports the conclusion that claimant's respiratory impairment is nonsevere and does not significantly diminish his ability to perform light and sedentary work, the ALJ's determination must be upheld.
 
 III.
 
 50
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Ann Aldrich, United States District Judge, Northern District of Ohio, sitting by designation
 
 
 [1]
 There is some confusion as to whether claimant ever worked in a coal mine. Dr. Penman indicated that claimant worked in the mines until June 1980. However, Dr. Myers noted that claimant's respiratory impairment existed in spite of the fact that he had never worked in a coal mine. Claimant has indicated that his work has caused him to be exposed to large amounts of rock dust
 Moreover, there is some question as to whether claimant was in fact the subject of this particular examination. The upper left-hand corner of the report indicates that the patient's last name ended in "1". Furthermore, the patient was 39 years of age in 1980. Claimant, on the other hand, turned 45 in November 1980.
 
 
 [2]
 Although claimant alleges that his respiratory difficulties increase upon exertion, there is also an indication that he is unable to tolerate exposure to heavy concentrations of dust. Such an impairment is categorized as an environmental limitation, which is a nonexertional impairment. See, e.g., Warmoth v. Bowen, 798 F.2d 1109 (7th Cir. 1986) (per curiam); Damron v. Secretary of Health & Human Services, 778 F.2d 279, 282 (6th Cir. 1985)