829 F.2d 1126
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph D. PESTA, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 86-3299
 United States Court of Appeals, Sixth Circuit.
 September 24, 1987.
 
 Before BOYCE F. MARTIN, DAVID A. NELSON, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from a summary judgment in which the district court affirmed the Secretary's denial of Social Security disability insurance benefits. Because the Secretary's findings are supported by substantial evidence, we shall affirm. LeMaster v. Secretary of Health and Human Services, 802 F.2d 839, 840 (6th Cir. 1986).
 
 
 2
 The medical history of the claimant, Joseph Pesta, indicates a combination of exertional and nonexertional impairments. Although Mr. Pesta's application for disability benefits alleged disability because of an 'injury to foot and leg,' and he testified to significant back pain, Mr. Pesta does not press these claims on appeal. The Administrative Law Judge concluded that Mr. Pesta retains the residual functional capacity for 'medium' work despite any exertional limitations, 20 C.F.R. Sec. 404.1567(c), and that conclusion is not challenged here.
 
 
 3
 The substance of Mr. Pesta's contention on appeal, rather, is that the Secretary ought to have found the claimant disabled because he suffers from a personality disorder and depression compounded by substance abuse. The application for benefits, filed March 4, 1980, asserts disability commencing February 15, 1980. Because Mr. Pesta continued to meet earnings requirements through the date of the hearing before the ALJ in January of 1983, the ALJ was required to consider whether disability was shown during the intervening period.
 
 
 4
 We are urged to conclude that the ALJ acted improperly in relying on a June, 1980, psychiatric report by a Dr. Nalluri, the claimant having introduced a more recent evaluation by a clinical psychologist named Heltzel in which Healtzel said the claimant's condition had dramatically deteriorated. Although Dr. Nalluri's report precedes that of the psychologist Heltzel by approximately two and one-half years, our reivew of the course of the claimant's mental condition, as disclosed by the medical record, convinces us that the ALJ did not misuse the earlier report.
 
 
 5
 As early as January of 1978, when Mr. Pesta was hospitalized for a broken ankle, the records showed that he had a history of drinking and at one point had been treated with antabuse. Marital problems and unemployment spanning several months were cited as causes of a state of depression and excessive drinking that resulted in a two-day hospitalization in June, 1978. Mr. Pesta was released at that time on medication and was referred to Alcoholics Anonymous. He was employed at General Motors from August through November of 1978, but quit that job because 'I couldn't take the pressure.'
 
 
 6
 The only medical entry for 1979 is found in the record of a hospital admission on February 28 of that year for anxiety and excessive drinking. Mr. Pesta left the hospital against medical advice and apparently without treatment. Although he was unemployed during the early part of 1979, he went to work as a general laborer for Steel City in mid-summer of 1979.
 
 
 7
 That employment continued until February of 1980, when Mr. Pesta was fired from Steel City because of absenteeism. The alleged disability was claimed to have begun at that time. On March 17, 1980, Pesta admitted himself to the hospital because of depression and alcohol abuse, but again left (against medical advice) without treatment. Within a month the claimant returned to the hospital for excessive ingestion of drugs--Valium, Serax, Mellaril, Percodan--in combination with alcohol. He was released on April 15, 1980, after a two day stay in the hospital.
 
 
 8
 The psychiatric report of Dr. Nalluri, dated June 5, 1980, states that the claimant ascribed his problems to what was termed a 'layoff' in February of 1980. It says he had been drinking and taking his prescribed medication in excess doses since that time. Dr. Nalluri thought Pesta was suffering from 'mild depression' and was 'capable of substantial gainful activity.' The doctor recommended referral to the Bureau of Vocational Rehabilitation, stating that Mr. Pesta could withstand 'minimal job stress and strain' and had a 'fair' ability to relate to other employees and to understand and follow instructions.
 
 
 9
 Dr. Nalluri's opinion that Pesta was employable is supported by a December 29, 1980, letter from a Dr. Jenkins, who had been treating the claimant's depression since December, 1977. Dr. Jenkins wrote that he examined Pesta in June, 1980, 'with the hopes that [the Bureau of Vocational Rehabilitation] could retrain him for something he might be able to do.'
 
 
 10
 Although the ALJ found that the claimant 'last performed substantial gainful activity in February 1980,' record evidence suggests that Mr. Pesta did have some intermittent employment subsequent to that date. Mr. Pesta was hospitalized for ten days in November of 1981, complaining of depression brought on by the breakup of his marriage. The hospital intake form from that stay shows that Mr. Pesta was employed by 'Pilgrim Aluminum,' and had been for a period of four months. An undated 'work history' form submitted by the claimant to Social Security indicates that Mr. Pesta worked at Pilgrim Extrusions for some period after June, 1981, but was on sick leave.
 
 
 11
 Except for the report that the claimant's attorney obtained from the clinical psychologist, Dr. Heltzel, a medical report from the 1981 hospitalization is the last to refer to Mr. Pesta's mental condition. That report says that although Mr. Pesta could not initially comprehend his wife's decision to leave him, he came to accept her decision during his hospital stay and was in improved condition upon release. (Testimony at the hearing indicated that the couple's divorce, terminating a marriage of eleven years, became final in January of 1982.)
 
 
 12
 Mr. Pesta had a three-day hospitalization late in January of 1982, following an automobile accident. The final diagnosis was a concussion; there was no mention of any psychological problem. There was also a five-day hospitalization in October, 1982, for back pain. That hospital record suggests that plaintiff had injured his back on October 4, 1982, upon return to work after a one-and-a-half month sick leave for low back pain. The hospital record fails, again, to indicate any psychological problem.
 
 
 13
 On December 2, 1982, Pilgrim Extrusions, Inc., informed Pesta that he would be suspended for five working days and then terminated because of his 'unexceptionable [sic] attendance, and your falsified employment application . . .'
 
 
 14
 The final health record before the ALJ was the report, dated December 31, 1982, of the psychological evaluation performed by Dr. Heltzel. Notwithstanding that the October, 1982, hospital report mentions no psychological problem, and notwithstanding that Mr. Pesta had been injured at work earlier in October, Dr. Heltzel had the overall impression that the claimant 'is totally dysfunctional at this time and unnable [sic] to deal adequately with even trivial problems.' Calling him a 'seriously disturbed individual,' Dr. Heltzel opined that
 
 
 15
 'Mr. Pesta is unnable [sic] to be gainfully employed. Furthermore, I consider it highly unlikely that he can recover sufficiently to be employable. He may be able to regain composure for brief time periods, and possibly even hold jobs temporarily, but more realistically I expect progressive personality deterioration. Prognosis is poor.'
 
 
 16
 Dr. Heltzel made a number of diagnoses organized according to the categories of the DSM-III Diagnostic and Statistical Manual of Mental Disorders (3rd ed., 1980). Mr. Pesta was said to have a generalized anxiety disorder, a dysthymic disorder, mild dementia associated with alcoholism (suspected), a borderline personality disorder, and a dependent personality disorder.
 
 
 17
 Mr. Pesta testified before the ALJ on January 3, 1983, within a week of the examination by Dr. Heltzel. At the time of the hearing Pesta was 37 years old. He stood six feet tall, weighed 185 pounds, and stated he was a high school graduate. The claimant admitted that he drank half of a fifth of liquor a day and as much beer and wine 'as I can get.' He also testified that he took prescribed drugs '[j]ust to take them.' He described his mental problem as 'I just can't seem to function anymore, you know, like do anything,' and claimed that his situation had got worse since February of 1980. Mr. Pesta could not give concrete examples of any deterioration, however. He said he preferred not to go out too often and only saw a few friends once every two months. He did not have any activities or hobbies, and said he would spend his day watching television, sitting in the apartment, or taking a walk to a nearby store. The ALJ was told that the claimant did enjoy watching football on television, and had gone to two college games in 1981. He would sometimes go out to a restaurant for a meal.
 
 
 18
 At the time of the hearing Mr. Pesta lived with the mother of his fiancee. His fiancee testified to his dependency on alcohol and drugs and said that he did little at the apartment; her mother did the cooking and the laundry. The fiancee indicated that Pesta despised company, and she testified to an episode where he had perhaps hallucinated for several days.
 
 
 19
 The ALJ's opinion acknowledged Mr. Pesta's alcohol abuse and psychological problems. Refusing to credit evidence of a disabling psychological condition, however, the ALJ accepted Dr. Nalluri's conclusion of 'mild depression.' Although Mr. Pesta's psychological condition 'precludes him from performing varied and high stress-type jobs,' the ALJ said, '[it] does not significantly affect his residual functional capacity for a wide range of medium work.' It was pointed out that Dr. Heltzel's discouraging assessment was not supported by a 'correspondingly severe diagnosis' or by objective clinical findings.
 
 
 20
 Dr. Nalluri's report antedated Dr. Heltzel's by some two and one-half years, but the medical record does not demonstrate that Mr. Pesta's condition had substantially deteriorated since mid-1980. Dr. Nalluri's opinion that Mr. Pesta was employable as of mid-1980, even though Pesta had been twice admitted to the hospital in the preceding months, is supported by the letter by Dr. Jenkins. No further treatment was needed until the hospitalization of November, 1981. That hospitalization--for being 'very depressed'--was a direct result of Mrs. Pesta's announcement that the marriage was over. During the hospitalization, however, Mr. Pesta accepted his wife's decision and was discharged in 'improved' condition. There is no evidence that Mr. Pesta attempted to obtain treatment for his depression/drinking at any time in 1982 prior to the evaluation that Dr. Heltzel performed at year-end at the instance of the claimant's attorney. No psychological problem was even mentioned in the records for Mr. Pesta's October, 1982, hospitalization. The medical record suggests a chronic problem since the late 1970's, not one that has progressively worsened.
 
 
 21
 Equally important is the fact that Mr. Pesta worked intermittently between mid-1980 and late 1982. Mr. Pesta testified he had worked a few days in 1982 and had worked in October, 1981. Both the November 3, 1981, hospital admission form and a work history supplied by Mr. Pesta indicate that he had worked for Pilgrim Extrusions in 1981.
 
 
 22
 Although Mr. Pesta testified to but a few days of employment in 1982, the hospital records dating from October of 1982, suggest that he had been on sick leave for only a short time prior to his return to work on October 4, 1982. Mr. Pesta's employment at Pilgrim Extrusions was not terminated until December 2, 1982. Even if the medical record as to sick leave is incorrect, it is undisputed that Pesta did return to work in October of 1982, and could not continue working because of a physical injury suffered while 'lifting heavy pieces of metal.'
 
 
 23
 In light of Dr. Nalluri's 1980 report, and given the uneven but not clearly declining course of Mr. Pesta's condition, there is substantial evidence supporting the ALJ's conclusion. The ALJ was not required to accept either the hearing testimony or Dr. Heltzel's opinion at face value. 'This Court may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility.' Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).
 
 
 24
 Mr. Pesta submitted to the Appeals Council a letter from Dr. Heltzel indicating that the claimant satisfied the 'listings' for psychological impairments. 20 C.F.R. Part 404, Subpt. P, App. 1 ('Listing of Impairments'). The claimant bears the burden of establishing that his medical impairment meets or is medically equivalent to an impairment in the listings. Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986). In 1985 new listings were promulgated for mental disorders, and, we shall consider both the old and new listings. LeMaster, supra, 802 F.2d at 841.
 
 
 25
 Among the categories in the old listings are these:
 
 
 26
 '12.03 Functional psychotic disorders (mood disorders, schizophrenias, paranoid states). With both A and B:
 
 
 27
 A. Manifested persistence of one or more of the following clinical signs:
 
 1. Depression (or elation); or
 2. Agitation; or
 3. Psychomotor disturbances; or
 4. Hallucinations or delusions; or
 
 28
 5. Autistic or other regressive behavior; or
 
 6. Inappropriateness of affect; or
 
 29
 7. Illogical association of ideas;
 
 
 30
 B. Resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people.
 
 
 31
 12.04 Functional nonpsychotic disorders (psychophysiologic, neurotic, and personality disorders; addictive dependence on alcohol or drugs). With both A and B:
 
 
 32
 A. Manifested persistence of one or more of the following clinical signs:
 
 
 33
 1. Demonstrable and persistent structural changes mediated through psychophysiological channels (e.g., duodenal ulcer); or
 
 
 34
 2. Recurrent and persistent periods of anxiety, with tension, apprehension, and interference with concentration and memory; or
 
 
 35
 3. Persistent depressive affect with insomnia, loss of weight, and suicidal preoccupation; or
 
 
 36
 4. Persistent phobic or obsessive ruminations with inappropriate, bizarre, or disruptive behavior; or
 
 
 37
 5. Persistent compulsive, ritualistic behavior; or
 
 
 38
 6. Persistent functional disturbance of vision, speech, hearing, or use of a limb with demonstrable structural or trophic changes; or
 
 
 39
 7. Persistent, deeply ingrained, maladaptive patterns of behavior manifested by either:
 
 
 40
 a. Seclusiveness or autistic thinking; or
 
 
 41
 b. Pathologically inappropriate suspiciousness or hostility;
 
 
 42
 B. Resulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people.'
 
 
 43
 20 C.F.R. Part 404, Subpt. P, App. 1, Secs. 12.03, 12.04 (1983).
 
 
 44
 Sections 12.03 and 12.04 would appear to be mutually exclusive categories, one covering 'psychotic' disorders and the other 'nonpsychotic' disorders. The listings give as examples of 'functional psychotic disorders' conditions such as involutional psychosis, manic-depressive illness, psychotic depressive reaction, schizophrenia, and paranoia. 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.00(B)(2) (1983). By contrast, nonpsychotic disorders include neuroses where 'there are no gross falsifications of reality such as observed in the psychoses in the form of hallucinations or delusions.' 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.00(B)(3)(b) (1983).
 
 
 45
 A psychotic condition is understood as 'gross impairment in reality testing . . .. Direct evidence of psychotic behavior is the presence of either delusions or hallucinations without insight into their pathological nature.' DSM-III, Diagnostic and Statistical Manual of Mental Disorders (3rd ed., 1980), p. 367. We discuss Sec. 12.03, covering psychotic disorders, because claimant chose to do so before the Appeals Council and on appeal. In the letter presented to the Appeals Council, Dr. Heltzel describes Mr. Pesta's disorders as 'functional and nonpsychotic;' Dr. Heltzel nonetheless proceeded to opine that Pesta qualified under Listing Sec. 12.03.
 
 
 46
 Dr. Heltzel did refer to a 'history of hallucinations' as reported to him by the claimant and his fiancee, but no 'bizarre thought content or hallucinations were evident' at the time of the psychologist's December, 1982, evaluation. Dr. Nalluri had found no evidence of hallucination, and he considered Mr. Pesta's thought processes well organized, relevant and logical. Mr. Pesta did not testify to any problems with hallucinations, and the one instance of possible hallucinating mentioned by the fiancee may have been associated with an attempt by Mr. Pesta to end his substance dependency. Substantial evidence, then, supports the Secretary's determination that Sec. 12.03 was not satisfied because no 'persistence' of hallucinations or delusions was demonstrated.
 
 
 47
 If manifested persistence of depression was shown under Sec. 12.03(A), and if Mr. Pesta did have a functional psychotic disorder notwithstanding that Dr. Heltzel called it 'nonpsychotic,' Mr. Pesta would fail to satisfy the listing because of Sec. 12.03(B). (Any possible claim under old Sec. 12.04 would be defeated for the same reason, Sec. 12.04(B) entailing the same requirements as Sec. 12.03(B), with one addition.) Under both Secs. 12.03(B) and 12.04(B), the claimant must have a 'seriously impaired ability to relate to other people.' Although testimony at the hearing indicated that Mr. Pesta despised company and saw friends infrequently, there was no indication that he could not relate to his fiancee and her mother. Dr. Nalluri thought Mr. Pesta had a fair ability to relate to fellow workers and supervisors, and Dr. Jenkins' letter does not suggest any limitation in this area. The fact that Mr. Pesta was employed at both Steel City and Pilgrim Extrusions subsequent to Dr. Nalluri's evaluation is also relevant in this connection.
 
 
 48
 Under the new listings, which became effective as of August 28, 1985, substance addition disorders are listed separately. 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.09 (1986). Under that listing it is clear that substance addiction, in itself, is not sufficient to demonstrate disability. 'The new listing requires not only that the claimant be a substance abuser, but also that he satisfy the requirements of the listing for one of the nine other mental or physical disorders referred to in Sec. 12.09.' LeMaster, supra, 802 F.2d at 841. Mr. Pesta's abuse of alcohol and possibly other drugs need not establish disability in this case.
 
 
 49
 The new listing that Mr. Pesta has the best chance of satisfying is Sec. 12.04:
 
 
 50
 '12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
 
 
 51
 The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
 
 
 52
 A. Medically documented persistence, either continuous or intermittent, of one of the following:
 
 
 53
 1. Depressive syndrome characterized by at least four of the following:
 
 
 54
 a. Anhedonia or pervasive loss of interest in almost all activities; or
 
 
 55
 b. Appetite disturbance with change in weight; or
 
 
 56
 c. Sleep disturbance; or
 
 
 57
 d. Psychomotor agitation or retardation; or
 
 
 58
 e. Decreased energy; or
 
 
 59
 f. Feelings of guilt of worthlessness; or
 
 
 60
 g. Difficulty concentrating or thinking; or
 
 
 61
 h. Thoughts of suicide; or
 
 
 62
 i. Hallucinations, delusions or paranoid thinking; . . . AND
 
 
 63
 B. Resulting in at least two of the following:
 
 
 64
 1. Marked restriction of activities of daily living; or
 
 
 65
 2. Marked difficulties in maintaining social functioning; or
 
 
 66
 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
 
 
 67
 4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).'
 
 
 68
 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.04 (1986). Assuming Sec. 12.04(A) might be satisfied, Sec. 12.04(B) is not.
 
 
 69
 Mr. Pesta's car was stolen in December of 1982, but before that time, as he testified, he had no problem driving when he was sober. The claimant expressed an interest in football and had attended college games. He also took walks to a nearby store as a means of spending his time, and he returned to work on October 4, 1982. Substantial evidence would therefore support a finding that he did not suffer a 'marked restriction of activities of daily living' under Sec. 12.04(B). A difficulty in maintaining social functioning may be shown by an 'avoidance of interpersonal relationships, social isolation.' 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.00(C)(2) (1986). However, social functioning is shown by 'the ability to get along with others, . . . and responding appropriately to persons in authority, e.g., supervisors . . .' Id. There is no evidence to suggest that Mr. Pesta was unable to 'get along' with his fiancee, her mother, or fellow workers and supervisors. Further, there is no evidence of 'frequent failure' to complete tasks in a timely manner. The insufficiency of proof under Sec. 12.04(B) similarly defeats any possible claim under Sec. 12.08(B), encompassing personality disorders under the new listings.
 
 
 70
 Finally, it was not required that a vocational expert testify as to the availability of alternate employment. The ALJ determined that Mr. Pesta's exertional limitations prevented return to his past work but did not preclude employment at the 'medium' exertional level. 404 C.F.R. Sec. 404.1567(c). Pesta's mental (non-exertional) impairment, while preventing performance of 'varied and high-stress type jobs,' did not 'significantly affect his residual functional capacity for a wide range of medium work.' The ALJ therefore used the 'grid' as a framework for a finding of not disabled. 20 C.F.R. Part 404, Subpt. P, App. 2, Table No. 3, Rule 203.29.
 
 
 71
 Where substantial evidence supports a finding that a non-exertional impairment would not significantly limit the range of work that the claimant may perform, the existence of such an impairment does not preclude reliance on the grid. Channel v. Heckler, 747 F.2d 577, 582, n.6 (10th Cir. 1984) (collecting cases). The non-exertional limitation must 'be severe enough to restrict a full range of gainful employment at the designated [exertional] level' before vocational testimony is required. Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 537 (6th Cir. 1981), cert. denied, 461 U.S. 957 (1983). If Mr. Pesta's argument were accepted, 'any allegation of nonexertional limitations would preclude resort to the grid and thus frustrate the Congressional intention of simplifying and expediting the adjudicative process.' Id.
 
 
 72
 AFFIRMED.