978 F.2d 1258
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Daniel D. GIBBS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 92-3024.
 United States Court of Appeals, Sixth Circuit.
 Nov. 6, 1992.
 
 On Appeal from the United States District Court for the Northern District of Ohio, No. 91-00234; Streepy (M).
 N.D.Ohio
 AFFIRMED.
 Before RALPH B. GUY, Jr. and RYAN, Circuit Judges, and HULL, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Daniel D. Gibbs, appeals the district court's judgment affirming the denial of his application for disability insurance benefits. The single issue on appeal is whether the decision of the Secretary, finding Gibbs not disabled, is supported by substantial evidence.
 
 
 2
 We conclude that it is and therefore affirm the judgment of the district court.
 
 I.
 
 3
 Plaintiff Daniel D. Gibbs was born on May 6, 1950. He has twelve years of education but does not have a high school diploma. Before January 25, 1988, Gibbs had been employed as an assembler in an auto plant, a spray painter, and a retail store manager. On January 25, 1988, he was hospitalized for head injuries, including a skull fracture and a blood clot on the brain, suffered as the result of falling backwards down a series of steps and striking his head on a cement floor. Gibbs has not worked since the accident.
 
 
 4
 Gibbs filed an application for disability insurance benefits on July 12, 1988, alleging disability since the date of the accident. His application was denied, and he filed a request for a hearing. On December 11, 1989, Gibbs appeared with counsel and presented evidence in support of his claim to an Administrative Law Judge ("ALJ").
 
 
 5
 The evidence presented to the ALJ established the following: A physical examination following Gibbs's fall revealed a linear occipital fracture, and a CT scan showed multiple cerebral contusions and hematomas. Although Gibbs showed satisfactory medical improvement, he suffered significant residual cognitive defects as a result of his injuries. The doctors nevertheless determined that Gibbs's cognitive defects were not sufficiently severe to require rehabilitation, and Gibbs was discharged from the hospital.
 
 
 6
 Six weeks later, a CT scan revealed residual areas of encephalomalacia (softening of the brain) following intracerebral hematomas and contusions in the frontal and left temporal lobes. An electronystagnograph ("EGN") and caloric testing conducted several months later were consistent with a brain stem lesion or possible end organ peripheral vestibular dysfunction.
 
 
 7
 Dr. Mario Sertic reported in March 1988 that Gibbs had "improved nicely" but still complained of headaches, blurred vision and occasional dizziness, particularly when turning his head. Dr. George Ozbardacki reported in August that Gibbs had a central vestibular disorder that was "mild according to history" and was established by ENG. He further stated that Gibbs had no peripheral disorder and that his residual limitations were manifested by a mild loss of balance with head movement, a mild hearing loss, and occasional nausea.
 
 
 8
 Gibbs also underwent a consultative psychological evaluation in August. Following that evaluation, Dr. Fran Ezzo reported that Gibbs was fully oriented, and maintained adequate memory, judgment, and insight. Intelligence testing indicated a verbal IQ of 104, a performance IQ of 89, and a full-scale IQ of 97. Dr. Ezzo stated that the discrepancy between verbal and performance scores could be attributed to a neurological deficit that was caused by Gibbs's head injury. A Bender Motor-Gestalt test showed some neurologic involvement, and a personality test revealed evidence of some reactive depression and anxiety associated with the injury. Dr. Ezzo concluded that Gibbs had the ability to understand and follow instructions and to perform simple and repetitive tasks. He stated that Gibbs would have some difficulty adjusting to his injury and would probably have some problems withstanding the stress and pressure associated with daily work activities.
 
 
 9
 In October of 1988, Dr. Kottil W. Rammohan reported that Gibbs's physical capacities were unlimited but that he suffered some limitations on balancing and hearing. He advised environmental restrictions as a precaution against seizures.
 
 
 10
 In January 1989, Dr. John Barb, Gibbs's treating physician, stated that Gibbs had reported suffering petit mal seizures but noted that he had not observed Gibbs during such a seizure. Gibbs told the doctor that his seizures lasted for two or more minutes, during which time he had a blank stare and experienced hand tremors, fatigue, and excessive sweating. Dr. Barb reported that Gibbs's seizure disorder was being treated with medication. Dr. Barb further indicated at this time that he would like to see Gibbs try low stress work for an eight-hour workday.
 
 
 11
 In February 1989, Dr. Ray Romero reported that Dr. Barb had referred Gibbs for complaints of seizure activity. Dr. Romero reported that Gibbs's head injuries had resolved appropriately but observed that Gibbs had some changes in personality and experienced occasional confusion. Dr. Romero further noted that he had not observed Gibbs's seizures but stated that they were apparently not associated with biting of the tongue or urinary incontinence, although Gibbs's wife stated that he experienced "shaking."
 
 
 12
 In a report in June 1989, Dr. Barb stated that Gibbs had been unable to work since January of 1988, due to multiple occipital skull fractures, multiple contusions, a seizure disorder, headaches, and hypertension. In October 1989, Dr. Barb opined that Gibbs would be unable to perform an eight-hour job because of his physical and mental limitations but submitted no additional findings to support his opinion.
 
 
 13
 At the hearing, Gibbs testified that he became unable to work as a result of his head injuries. He stated that he remained unable to work because of seizures that persisted despite taking medication. He testified that the seizures occurred two to four times a month and lasted two or more minutes and that he often needed two hours of rest to recover from them.
 
 
 14
 Dr. Joel Steinberg testified as a medical expert at the administrative hearing. He stated that Gibbs's fall caused severe head trauma that was documented by a CT scan. He further stated that Gibbs might be experiencing complex partial seizures but that the seizures could be controlled through medication. Dr. Steinberg further testified that Gibbs had had only one seizure that was manifested by confusion and had experienced no loss of consciousness, incontinence, severe tremors, or rigidity in association with the seizures. Dr. Steinberg concluded that Gibbs's dysfunction would limit him only from working in dangerous environments (at unprotected heights or around moving machinery) or from performing tasks of above average complexity.
 
 
 15
 Richard Benish testified as a vocational expert at the administrative hearing. Benish stated that Gibbs's past work as an assembler and spray painter was unskilled and performed at a light-to-medium exertional level, and that his past work as a retail store manager was skilled and performed at a light exertional level. In response to the ALJ's hypothetical question, which took into account Gibbs's age, education, work experience, and the functional capacity to which the medical expert testified, Benish concluded that Gibbs could perform any of 25,920 jobs as a cleaner, 35,000 jobs as a general office clerk, and 954 jobs as a mail clerk in the regional economy.
 
 
 16
 The ALJ issued a decision denying Gibbs's application on the ground that Gibbs retained the residual functional capacity to perform a significant number of jobs in the national economy and was therefore not disabled. The Appeals Council denied Gibbs's request for review, and Gibbs filed an action in federal district court. The district court granted the Secretary's motion for summary judgment, affirming the Secretary's decision. Gibbs timely appealed to this court.
 
 II.
 
 17
 Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence. Accordingly, this court's "review is limited to determining whether there is substantial evidence in the record to support the findings." Duncan v. Secretary of Health & Human Servs., 801 F.2d 847, 851 (6th Cir.1986). " 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Kirk v. Secretary of Health & Human Servs., 667 F.2d 524, 535 (6th Cir.), cert. denied, 461 U.S. 957 (1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In determining this question, the court must examine the evidence in the record "taken as a whole." Duncan, 801 F.2d at 852.
 
 III.
 
 18
 Gibbs contends that the ALJ's decision is not supported by substantial evidence. He makes three arguments in this regard. First, he maintains that the ALJ failed to give proper weight to the medical opinion of Gibbs's treating physician. Second, he argues that the ALJ improperly relied on the opinion testimony of the nontreating medical advisor who testified at the hearing, affording it inappropriate weight in light of the fact that it was inconsistent with the opinion of Gibbs's treating physician. Finally, he contends that the hypothetical question posed by the ALJ to the vocational expert was flawed because it did not include Gibbs's seizure disorder and therefore did not accurately reflect the facts of the case.
 
 
 19
 Gibbs concludes from all of the foregoing that the ALJ's decision was not supported by substantial evidence. We disagree.
 
 IV.
 Testimony of the Treating Physician
 
 20
 Gibbs's contends that the ALJ failed to accord proper weight to the opinion of Gibbs's treating physician, Dr. Barb. Although the Secretary should defer substantially to the medical reports of a treating physician when those reports are supported by specific clinical findings, the Secretary is not bound by a treating physician's broad conclusory statements concerning the ultimate issue of a claimant's disability. Garner v. Heckler, 745 F.2d 383, 391 (6th Cir.1984).
 
 
 21
 Here, Dr. Barb rendered just such a "broad conclusory statement[ ]": "In conclusion, I feel that Mr. Gibbs would not be able to perform a [sic] eight hour job due to both his physical and mental limitations at this time." The ALJ owed no deference to this broad, generalized conclusion, especially in light of the fact that on a previous occasion Dr. Barb had expressed his desire that Gibbs attempt low stress work for an eight-hour day. Moreover, as the ALJ observed, Dr. Barb offered no clinical evidence whatever in support of his revised opinion concerning Gibbs's ability to work an eight-hour day, and the ALJ was justified in according the opinion little weight.
 
 V.
 
 22
 Testimony of the Nontreating Medical Expert
 
 
 23
 Gibbs also contends that the district court improperly afforded greater weight to the testimony of the nontreating medical advisor than to the opinion of Dr. Barb. Although "it is true that a treating physician's diagnosis is to be given greater weight in the scales than the government's physician, that is only appropriate if the treating physician supplies sufficient medical data to substantiate the diagnosis." Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 538 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983). As noted, Dr. Barb failed to support his opinion that Gibbs was unable to work an eight-hour day with sufficient medical data. Consequently, the ALJ did not err by according greater weight to the opinion of the government's physician.
 
 VI.
 The Hypothetical Question Posed by the ALJ
 
 24
 Gibbs's third objection is that the ALJ's decision rests in significant part upon an "inaccurate hypothetical question."
 
 
 25
 In determining eligibility for disability benefits, the ALJ properly applied the following sequential evaluation:
 
 
 26
 1. An individual who is working and engaging in substantial gainful activity will not be found "disabled" regardless of medical findings. 20 C.F.R. § 404.1520(b).
 
 
 27
 2. An individual who does not have an impairment or combination of impairments which will significantly limit one's ability to do basic work will not be found to be disabled. 20 C.F.R. § 404.1520(c).
 
 
 28
 3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. 20 C.F.R. § 404.1520(d).
 
 
 29
 4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made. 20 C.F.R. § 404.1520(e).
 
 
 30
 5. If an individual's impairment is so severe as to preclude performance of past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed. 20 C.F.R. § 404.1520(f).
 
 
 31
 The ALJ found that Gibbs had not engaged in substantial gainful activity since he suffered his head injuries. He also found that the medical evidence established that Gibbs suffered severe medical impairments as a result of those injuries, but that they did not meet or equal a listed impairment. Finally, he concluded that although the evidence supported a finding that Gibbs could not perform his past relevant work, he retained the residual functional capacity to perform a significant number of jobs in the national and regional economies.
 
 
 32
 After the ALJ found that Gibbs was unable to perform his past relevant work, the burden shifted to the Secretary to come forward with evidence of other jobs in the national or regional economies that Gibbs could perform. Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980). In this regard, the Secretary produced a vocational expert whose testimony took the form of answers to hypothetical questions. In response to the ALJ's hypothetical question, which accounted for Gibbs's age, education, work experience, and the funcational capacity to which the government's medical expert testified, the vocational expert concluded that there were a substantial number of jobs in the national and regional economies that Gibbs could perform, including jobs as a cleaner, general office clerk, and mail clerk.
 
 
 33
 Gibbs challenged the ALJ's reliance on this testimony by contending that the hypothetical on which it was based was flawed because it did not account for Gibbs's seizure disorder. The court's opinion agrees.
 
 
 34
 Hypothetical questions posed to vocational experts must be supported by evidence in the record. Hardaway v. Secretary of Health & Human Services, 823 F.2d 922, 927 (6th Cir.1987). To be sure, an answer to a hypothetical question that does not correctly state a claimant's condition cannot constitute substantial evidence of the claimant's functional capacity. Douglas v. Bowen, 836 F.2d 392, 396 (8th Cir.1987). The question in this case, therefore, is whether the evidence in the record, taken as a whole, supports the ALJ's decision to exclude Gibbs's alleged seizure disorder from the hypothetical question that was posed to the vocational expert.
 
 
 35
 Gibbs alleged that he suffered seizures two to four times a month, that they lasted two or more minutes, and that he often required two or more hours of rest to recover from them. The record contains no conclusive objective medical data that Gibbs suffered from a seizure disorder. No one observed Gibbs suffer a seizure, and the medical tests were not conclusive on this question. Where the record lacks conclusive medical data concerning an alleged symptom such as this, the court must engage in the following two-step analysis:
 
 
 36
 "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain."
 
 
 37
 McCormick v. Secretary of Health & Human Services, 861 F.2d 998, 1002-03 (6th Cir.1988) (quoting Duncan v. Secretary of Health & Human Services, 801 F.2d 847, 853 (6th Cir.1986)).[1]
 
 
 38
 Although the language of this standard refers expressly to pain, the standard is also appropriately applied to other alleged disabling symptoms, such as Gibbs's alleged seizure disorder.[2]
 
 
 39
 Gibbs has clearly satisfied the first step of this analysis. The ALJ determined, on the basis of substantial medical evidence in the record, that Gibbs suffered severe head injuries and that those injuries resulted in certain medical impairments.
 
 
 40
 Application of the second step is less clear. Under the first prong of that step, the court must examine "whether objective medical evidence confirms the severity of the alleged pain [or other symptom] arising from the condition...." Duncan, 801 F.2d at 853 (emphasis added). Although the record contains Dr. Barb's opinion that Gibbs suffers from a seizure disorder, and the opinions of other doctors, including the government's expert, that Gibbs may experience seizures, the record contains no objective medical data confirming these opinions. The one test that may have indicated such a problem produced inconclusive results. Moreover, the testimony of both Dr. Barb, Gibbs's treating physician, and Dr. Steinberg, the government's expert, suggest that any seizures Gibbs might have experienced were not severe and that they could be substantially controlled with medication. Because Gibbs did not produce objective medical evidence confirming the severity of his seizure disorder, he failed to satisfy the first prong of step two.
 
 
 41
 The second prong of step two asks "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain [or other symptom]." Id. Gibbs makes a plausible argument that the record supported a conclusion that his head injuries were sufficiently severe so that they could possibly produce a seizure disorder of the sort from which he claims to suffer. Indeed, even the government's expert medical advisor acknowledged that Gibbs could be suffering from a seizure disorder. The ALJ would have been justified therefore to include this asserted condition in the hypothetical question he posed to the vocational expert.
 
 
 42
 Although the evidence in the record demonstrates that Gibbs's head injuries were sufficiently severe that they could possibly produce a seizure disorder, there is no objective medical evidence to support the conclusion that his injuries could "reasonably be expected to produce" a seizure disorder so severe that it would disable Gibbs from working at any job. No doctor opined, for example, that it was reasonably likely that Gibbs's injuries would lead to seizures so severe that he would require two hours of rest to recover from them. Indeed, the government's expert testified that any seizures resulting from Gibbs's injuries would probably not be severe and could be controlled by medication. The vocational expert's responses to the questions of Gibbs's counsel suggest that even if Gibbs suffered occasional mild seizures, he would still retain the capacity to work at a significant number of jobs in the national economy. Although the expert further opined that seizures that would require two hours of recovery time might make Gibbs unemployable, the record contained no objective medical evidence supporting a conclusion that Gibbs suffered from such severe seizure symptoms. The ALJ was therefore free to reject Gibbs's claims that he suffered from such severe seizures, even if he would have been justified in the contrary conclusion.
 
 
 43
 We conclude that the ALJ's finding that Gibbs retained the capacity to function in a substantial number of jobs in the national and regional economies was supported by substantial evidence.
 
 
 44
 AFFIRMED.
 
 
 45
 HULL, District Judge, dissenting.
 
 
 46
 Not a single doctor who examined Mr. Gibbs or reviewed his medical records doubted that he had the seizures he described or that they were followed by nausea, etc. Mr. Gibbs' credibility was never called into question. The objective medical evidence of significant brain damage showed that he had a medically ascertainable condition that could be expected to cause these symptoms. See Cohen v. Secretary of Health and Human Services, --- F.2d ---- (6th Cir. No. 91-2011, May 7, 1992); Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir.1986). For this reason, it was improper for the ALJ to ask a hypothetical question of vocational expert Richard Benish which did not include reference to the seizure disorder. In addition, the ALJ improperly gave greater weight to the opinion of Dr. Steinberg, a medical expert, who attended the hearing but had never examined the claimant, than to the opinion of Dr. Barb, Mr. Gibbs' long-term treating physician. Neither the opinion of a vocational expert, based upon an inaccurate hypothetical question, nor the opinion of a medical expert which contradicts that of a treating physician, if the latter's opinion is appropriately supported by medical findings, can properly be considered substantial evidence in support of the Secretary's position. See Varley v. Secretary of Health and Human Services, 820 F.2d 777, 779 (6th Cir.1987); King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984); and Myers v. Weinberger, 514 F.2d 293, 294 (6th Cir.1975). I would reverse the district court's ruling and remand this case with instructions that it be remanded to the Secretary for an award of benefits.
 
 
 
 *
 The Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 Although the Duncan case relied in part on statutory language that was subject to a sunset provision in establishing this standard, the McCormick court expressly held that the Duncan standard applies to cases arising after the sunset provision. McCormick, 861 F.2d at 999
 
 
 [2]
 Indeed, the statutory language on which the Duncan court relied referred to " 'pain or other symptoms.' " Duncan, 801 F.2d at 852 (quoting 42 U.S.C. § 423(d)(5)(A))